[991 NYS2d 68]

US BANK NATIONAL ASSOCIATION, Appellant, v JOSE SARMIENTO, Respondent, et al., Defendants.

Second Department, July 30, 2014

APPEARANCES OF COUNSEL

*Hogan Lovells US LLP*, New York City (*David Dunn* and *Nathaniel E. Marmon* of counsel), for appellant.

*Fuster Law, P.C.*, Long Island City (*J.A. Sanchez-Dorta* of counsel), for respondent.

## OPINION OF THE COURT

LEVENTHAL, J.

On appeal in this mortgage foreclosure action, the plaintiff contends that the Supreme Court erred in determining that it failed to negotiate in good faith during mandatory settlement conferences conducted pursuant to CPLR 3408, and that, in any event, the Supreme Court lacked the authority to impose any sanctions against it on the ground that it violated the "good faith" requirement of CPLR 3408 (f). In addressing these contentions, we set forth the proper standard for determining whether a party acted in good faith pursuant to CPLR 3408 (f). Further, we hold that the Supreme Court properly concluded that the plaintiff failed to negotiate in good faith and that the Supreme Court had the authority to sanction the plaintiff for that failure.

In May 2009, the plaintiff, as successor trustee to Bank of America, National Association (Successor by Merger to LaSalle Bank National Association), as trustee for Morgan Stanley Mortgage Loan Trust, 2007-2AX, commenced this action in the Supreme Court, Kings County, to foreclose a mortgage secured by residential property located in Brooklyn. In the complaint, the plaintiff alleged that the defendant homeowner, Jose Sarmiento, defaulted on the subject mortgage by failing to make the monthly payment due on October 1, 2008. The plaintiff elected to call due the entire amount secured by the mortgage, in the principal sum of $578,388.75, plus interest at an annual rate of 8.25%, accruing from September 1, 2008. Issue was joined by Sarmiento's service of a pro se verified answer dated July 17, 2009, which was accompanied by a notice to produce documents.

In an affidavit, Sarmiento averred that, in May 2008, he lost much of his monthly income and that, as a consequence, he was unable to make his monthly mortgage payment due on October 1, 2008, and the payments due thereafter. In September 2008, Sarmiento contacted America's Servicing Company (hereinafter ASC), the mortgage servicing agent of the lender, and a wholly

owned subsidiary of Wells Fargo Bank, N.A. (hereinafter together ASC/Wells), in order to discuss a loan modification. Sarmiento was told that he did not qualify for a loan modification because he had insufficient income. In February 2009, Sarmiento found an additional tenant for the subject property, and began receiving monthly rental income in the sum of $4,652. According to Sarmiento, notwithstanding his augmented income, ASC/Wells repeatedly refused to modify his loan.

In September 2009, this matter was referred to a Court Attorney Referee for a mandatory settlement conference pursuant to CPLR 3408. Sarmiento initially appeared pro se at the settlement discussions, and later obtained pro bono counsel. ACS/Wells, through their counsel,[1] appeared at the settlement discussions on behalf of the plaintiff. From September 14, 2009, to January 14, 2011, 18 settlement conferences were held. What transpired during the settlement conferences is detailed in the report of the Court Attorney Referee, dated April 20, 2011.

The Court Attorney Referee's Report

The report of the Court Attorney Referee set forth the following facts. On October 29, 2009, Sarmiento submitted to ACS/Wells a Home Affordable Mortgage Program (hereinafter HAMP) application.[2] On November 18, 2009, upon the request of ASC/Wells, Sarmiento submitted updated financial documents. According to the Court Attorney Referee, Sarmiento met the basic criteria for HAMP eligibility since: (1) the subject property was a one-to-four-family residence; (2) Sarmiento's monthly mortgage payment of principal, interest, property tax, and insurance exceeded 31% of his gross monthly income; and (3) the principal balance of the loan was equal to or less than $729,750.

At a settlement conference held on November 30, 2009, ASC/Wells confirmed that it had received Sarmiento's HAMP application and his updated financial documents, and represented that it would make a decision on the application within one week, even though it had 30 days to make that decision. Upon her review of Sarmiento's income, the Court Attorney Referee directed him to set aside the sum of $2,000 per month begin-

---

1. ACS/Wells was represented by the law firm of Steven J. Baum, P.C.

2. HAMP is a federal program that is intended to help homeowners avoid foreclosure "by modifying loans to a level that is affordable for borrowers now and sustainable over the long term" (Administrative Website for Servicers, Home Affordable Modification Program: Overview, https://www.hmpadmin.com/portal/programs/hamp.jsp [accessed July 16, 2014]).

ning December 1, 2009, to demonstrate his good faith and his ability to make modified mortgage payments and, if necessary, to use as a down payment on a non-HAMP, traditional loan modification.

First HAMP Denial

By letter dated January 12, 2010, ASC/Wells denied Sarmiento's HAMP application on the ground that he did not reside at the subject property as his primary residence. After Sarmiento asserted that there was no factual basis for ASC/Wells to have concluded that the property was not his primary residence, ASC/Wells conceded that Sarmiento resided at the property.

At a settlement conference conducted on February 2, 2010, ASC/Wells reported that Sarmiento's HAMP application was complete and still under review. ASC/Wells asserted, however, that it required a broker's price opinion (hereinafter BPO) to determine the value of the property, which was necessary before a Net Present Value (hereinafter NPV) test could be conducted under HAMP. The NPV test would determine whether a loan modification or a foreclosure sale was more lucrative to the mortgage lender/investor.

Second HAMP Denial

By letter dated April 2, 2010, ASC/Wells advised Sarmiento that his HAMP application was again denied, this time on the ground that an affordable monthly payment amount—equal to or less than 31% of gross monthly income—could not be reached. In an email message from ASC/Wells's counsel to Sarmiento's counsel, ASC/Wells stated that Sarmiento's HAMP application was denied because of a monthly income deficit of $1,100. According to the Court Attorney Referee, "Servicer ASC/Wells was evaluating . . . Sarmiento for a [HAMP] modification using the wrong income figures, although the defense thoroughly documented the employment and rental income that . . . Sarmiento and his wife earned each month." By letter dated April 7, 2010, Sarmiento's counsel informed ASC/Wells of this error, and referred ASC/Wells to Sarmiento's previously submitted pay stubs, bank statements, and rental agreements, which reflected a gross monthly income of $6,303. Sarmiento's counsel further requested a denial notice with greater specificity than set forth in the denial letter of April 2, 2010. Pursuant to Sarmiento's rights under HAMP, his counsel requested that ASC/Wells produce the inputs and data that ASC/Wells used in performing the NPV test.

In an email message dated April 9, 2010, ASC/Wells advised Sarmiento's counsel that it had never conducted an NPV test

on Sarmiento's HAMP application because the file had not reached the NPV calculation phase, and that the denial was "due to [an inability to] reach an affordable payment." By letter dated April 12, 2010, Sarmiento's counsel reiterated his objections to the HAMP denials, and requested "that ASC/Wells comply with HAMP guidelines and complete its modification review."

At a settlement conference held on April 13, 2010, and by letter dated April 22, 2010, Sarmiento requested a proper review of his HAMP application. According to the Court Attorney Referee, ASC/Wells replied that it "had misplaced income documentation" and that some other documentation had become "stale." As a consequence of its characterization of the status of the documentation, ASC/Wells requested that Sarmiento submit a new HAMP application. The Court Attorney Referee instructed Sarmiento's counsel to resubmit and update the HAMP application, and directed "ASC/Wells to escalate and expedite the HAMP review." Sarmiento submitted an updated HAMP application to ASC/Wells on April 26, 2010.

Third HAMP Denial

At a settlement conference held on May 11, 2010, ASC/Wells reported that it had "escalated" review of Sarmiento's HAMP application, and that such review was still incomplete. Two days later, however, ASC/Wells informed Sarmiento's counsel, in an email message, that it was again denying his HAMP application "due to not being able to reach affordability." The email message further stated "this property is not affordable," and requested Sarmiento's counsel to "refer the borrower to our liquidations department for further foreclosure prevention options." According to the Court Attorney Referee, the email message dated May 13, 2010, "failed and refused to demonstrate that Sarmiento was ineligible for a HAMP modification."

By letter dated May 28, 2010, Sarmiento's counsel requested more specific information about the denial, and again demanded the inputs and data that ASC/Wells used to conduct the NPV test in connection with Sarmiento's HAMP application. ASC/Wells did not provide the requested information. The Court Attorney Referee observed that

> "[a]lthough HAMP guidelines require production of the NPV inputs upon request so that borrowers can review the propriety of a denial and challenge the accuracy of the NPV inputs, Services ASC/Wells

ignored[ ] the written requests [from Sarmiento's counsel] for the data, and failed to produce the NPV values. Indeed, ASC/Wells failed to demonstrate that an NPV test had, in fact, been run."

As set forth in the report of the Court Attorney Referee, on June 2, 2010, Sarmiento filed a formal complaint against ASC/Wells with the HAMP support center on the ground that ASC/Wells refused to properly assess his HAMP application. On June 8, 2010, the HAMP support center advised Sarmiento that ASC/Wells had denied his HAMP application because he had $25,000 in liquid assets, which exceeded the maximum limit. The report of the Court Attorney Referee noted, however, that the $25,000 reflected funds which she had previously directed Sarmiento to set aside.

Nevertheless, at a settlement conference held on July 1, 2010, ASC/Wells reported that Sarmiento's HAMP application was "still under review," and that this review would be completed no later than two weeks after that date. ASC/Wells added that the funds that Sarmiento set aside at the direction of the Court Attorney Referee would not affect his HAMP application. Sarmiento's counsel made a third request for the inputs and data that ASC/Wells used in the NPV test; ASC/Wells replied that it "did not have the NPV inputs because the latest denial related to a non-HAMP modification." The Court Attorney Referee adjourned the settlement conference until July 19, 2010, to await the results of ASC/Wells's review of Sarmiento's HAMP application.

At the settlement conference held on July 19, 2010, ASC/Wells reported that it had not completed its HAMP review. Moreover, consistent with the statement of the HAMP support center dated June 8, 2010, counsel for ASC/Wells reported that ASC/Wells had previously denied Sarmiento's HAMP application because of "excess resources." The Court Attorney Referee stated that

"[i]n light of the repeated delays, the baseless denials, and obvious mishandling of the loan file by both ASC/Wells and [counsel for ASC/Wells] before a HAMP review was even done, I directed an ASC/Wells representative with personal knowledge and settlement authority to appear in person at the next settlement conference."

At the next settlement conference, which was held on September 14, 2010, Eliza Melendez of ASC/Wells appeared, and explained that "Sarmiento's HAMP application was still under

review and that a new BPO was required to value the [property] for the NPV test." The Court Attorney Referee described Melendez as having limited knowledge of Sarmiento's file, and no settlement authority. Sarmiento's counsel asserted that ASC/Wells should waive at least nine months of accrued interest because of the "inexplicable delays" in ASC/Wells's HAMP review. The Court Attorney Referee directed the vice president of ASC/Wells to personally appear at the next settlement conference.

The next settlement conference was held on September 28, 2010. At that time, Tracy Brooks, a Loan Administration Manager in the Home Preservation Department of ASC/Wells, personally appeared, and she reported that the HAMP review was incomplete because Sarmiento had not submitted certain documents. However, when Brooks accessed Sarmiento's loan file on her personal laptop computer, she confirmed that the file was complete. Upon Brooks's request, she was allowed to review the file overnight. The next day, Brooks reported that ASC/Wells needed a property tax bill and a copy of Sarmiento's property insurance declaration page, and that she was expediting the HAMP review.

At the next settlement conference, which was held on October 5, 2010, ASC/Wells offered a traditional, non-HAMP loan modification, in which the annual percentage rate (hereinafter APR) was lowered from 8.25% to 4%. ASC/Wells explained that it "had not made a HAMP offer because it was still 'trying to figure out what to do' about the informal escrow account that . . . Sarmiento had set aside at [the Court Attorney Referee's] direction."

Fourth HAMP Denial

Meanwhile, according to the Court Attorney Referee, "ASC/Wells sent . . . Sarmiento a denial letter [dated October 6, 2010], erroneously and preposterously stating that he was denied a HAMP modification because he was *current on his mortgage loan and not at risk of default.*"

At a settlement conference held on October 12, 2010, ASC/Wells "reported for the first time that an NPV test had been run and that [Sarmiento] had failed," meaning that a HAMP modification would not be more favorable to the plaintiff than a foreclosure sale. ASC/Wells provided none of the data or inputs it had used to conduct the NPV test, and reiterated its offer of a traditional, non-HAMP loan modification. Sarmiento rejected the non-HAMP loan modification as unaffordable.

A few weeks later, in an email message dated November 2,

2010, ASC/Wells provided some of the data and inputs it had used to conduct the NPV test. According to the Court Attorney Referee, this data showed that ASC/Wells conducted the NPV test in November 2010, which was 25 months after Sarmiento defaulted, and one year after ASC/Wells had initially denied Sarmiento's HAMP application. The Court Attorney Referee calculated that, as a result of ASC/Wells's delay, more than $40,000 in arrears accrued on the loan.

On November 5, 2010, ASC/Wells offered Sarmiento a second traditional, non-HAMP modification, in which the APR was initially dropped to 2%, but then increased to 4%. Sarmiento rejected that offer.

At a settlement conference held on January 14, 2011, ASC/Wells stated that it would make no further modification offers. ASC/Wells then retained Hogan Lovells, LLP (hereinafter Hogan) as cocounsel to Steven J. Baum, P.C., in anticipation of a hearing pursuant to CPLR 3408 before the Supreme Court to determine whether it had failed to negotiate in good faith. According to the Court Attorney Referee, at that conference, Hogan acknowledged that ASC/Wells had handled Sarmiento's loan "poorly," but stated that ASC/Wells could not "do anything for . . . Sarmiento because of excessive forbearance."

No progress on a settlement was made in three subsequent settlement conferences. With the parties at an impasse, the Court Attorney Referee directed them to submit position statements for use in the preparation of the report. In her report, the Court Attorney Referee determined that the plaintiff and ACS/Wells had failed to negotiate a loan modification in good faith, and had not complied with HAMP guidelines. Thus, the Court Attorney Referee recommended, inter alia, that the Supreme Court conduct a hearing to determine whether sanctions should be imposed against the plaintiff and ASC/Wells and its counsel.

Sarmiento's Motion for an Award of Sanctions

By notice of motion dated June 17, 2011, Sarmiento moved to bar the plaintiff from collecting interest or fees accrued on the subject loan from December 1, 2009, "to date," to bar the plaintiff from collecting from him any attorney's fee or costs incurred "to date" in this action, and to direct the plaintiff to review the subject loan for a HAMP modification using an unpaid principal balance that excluded interest, fees, and costs that had accrued from December 1, 2009, "to date." In support of his motion, Sarmiento submitted, inter alia, his counsel's affirmation, to which were appended, as exhibits, an affidavit

from Sarmiento, excerpts from a handbook entitled "Making Home Affordable Handbook for Servicers of Non-GSE Mortgages," letters and copies of email messages between ASC/Wells and Sarmiento that were sent during 2010, and a proposed order. In an affirmation, Sarmiento's counsel argued that the conduct of ASC/Wells demonstrated an "egregious refusal to negotiate in good faith, including its repeated delays and baseless denials of Mr. Sarmiento's request for a modification in violation of HAMP guidelines."

### The Plaintiff's Opposition

In opposition to Sarmiento's motion, the plaintiff submitted, inter alia, an affidavit from Kyle N. Campbell, Vice President of Loan Documentation for ASC/Wells.

Campbell averred as follows: on February 18, 2010, the plaintiff received all documents necessary to review Sarmiento's HAMP application. By letter dated April 2, 2010, the application was denied because Sarmiento's debt-to-income ratio exceeded HAMP limits, inasmuch as his monthly expenses were $7,823.64 and his monthly income was only $4,728.94. After receiving additional financial documents in late April 2010, the plaintiff again reviewed the loan file but, by letter dated May 13, 2010, Sarmiento's HAMP application was again denied, as was the possibility of a traditional, non-HAMP loan modification, because his debt-to-income ratio remained excessive, specifically, he had monthly income of $3,839.91, and monthly expenses of $7,253.22.

In September 2010, the plaintiff offered Sarmiento a non-HAMP loan modification, lowering the APR of the loan from 8.25% to 4%. Sarmiento rejected that offer, as it was not made pursuant to HAMP. In response, the plaintiff made a second non-HAMP loan modification offer, in which the APR of the loan would be initially lowered to 2% and gradually increased to 4%. Sarmiento also rejected that offer. Campbell asserted that the plaintiff could not offer any further modifications because of Sarmiento's "limited income and his delinquency in making any payments under the loan for more than two years."

On August 2, 2011, the parties stipulated, among other things, that Sarmiento's motion seeking, inter alia, to bar the plaintiff from collecting interest or fees that accrued on the subject loan since December 1, 2009, would be decided without an evidentiary hearing.

The Order Appealed From

Based upon the papers submitted, the Supreme Court, in the order appealed from, inter alia, granted Sarmiento's motion to bar the plaintiff from collecting interest or fees that accrued on the subject loan since December 1, 2009, to bar the plaintiff from recovering any costs or attorneys' fees it incurred in this action, and to direct the plaintiff to review the subject loan for a HAMP loan modification using correct information and without regard to interest or fees that have accrued on the subject loan since December 1, 2009. The Supreme Court determined that, while the plaintiff had failed to negotiate in good faith as required by CPLR 3408 (f), Sarmiento had acted in good faith. The court determined that, while Sarmiento and his counsel acted quickly and had been in contact with the plaintiff and ASC/Wells, the plaintiff and ASC/Wells has failed to respond to Sarmiento's "requests for very basic information" related to his HAMP application, and their counsel's communications with Sarmiento had sown confusion, distress, and doubt by including, among other things, confusing and vague rejection notices and requests for duplicative documents. The court stated:

> "To describe the Plaintiff's attitude succinctly: it was happy to do equity when it brought the underlying action for foreclosure, but stubbornly refused to do equity when as a result of statute (CPLR 3408), it was forced to sit down at the negotiating table with the homeowner and attempt to work out a deal. Put otherwise, the only 'delay' that is legal in a foreclosure action is the delay imposed by CPLR 3408, and good faith means participating honestly, cleanly, and mutually in that 'delay' process. Otherwise, this Court may exercise its equitable powers to restrict any remedy otherwise available."

The plaintiff appeals.

HAMP

The federal response to the mortgage foreclosure crisis included the creation of HAMP, which arose as part of the Emergency Economic Stabilization Act of 2008 (12 USC § 5201 *et seq.*) and the Helping Families Save Their Homes Act of 2009 (Pub L 111-22, § 1 [a], 123 Stat 1632, 1632 [111th Cong, 1st Sess, May 20, 2009]) (*see JP Morgan Chase Bank, N.A. v Ilardo*, 36 Misc 3d 359, 366 [Sup Ct, Suffolk County 2012]). HAMP is administered by the Federal National Mortgage Association (hereinafter Fannie Mae), as an agent of the United States Treasury Department (*see id.* at 366). The purpose of HAMP "is to

provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable reduced levels, without discharging any of the underlying debt" (*id.*).

Fannie Mae entered into agreements with numerous home loan servicers, including Wells Fargo, pursuant to which the servicers "agreed to identify homeowners who were in default or would likely soon be in default on their mortgage payments, and to modify the loans of those eligible under the program" (*Wigod v Wells Fargo Bank, N.A.*, 673 F3d 547, 556 [7th Cir 2012]). HAMP provides lenders and loan servicers an incentive "to offer loan modifications to eligible homeowners" (*Young v Wells Fargo Bank, N.A.*, 717 F3d 224, 228 [1st Cir 2013]; *see Edwards v Aurora Loan Servs., LLC*, 791 F Supp 2d 144, 148 [D DC 2011] [explaining that, under HAMP, the United States Treasury Department "pay(s) financial incentives to servicers and loan owners/investors that are sufficient to make a HAMP modification a better financial outcome than foreclosure for the servicer and investor"]).

When a borrower applies for a HAMP loan modification, the first step is to determine HAMP eligibility, which includes, among other things, consideration of whether the subject loan originated prior to January 1, 2009, the subject property is improved by a one-to-four-family house, the borrower resides in the house, and, prior to modification, the borrower's monthly mortgage payment exceeded 31% of the borrower's verified gross monthly income (*see* Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, version 3.2, ch 2, § 1.1 at 46 [June 1, 2011], available at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_32.pdf [HAMP Eligibility Criteria]). If the initial HAMP eligibility criteria are met, upon the borrower's submission to the servicer of the required financial information, the servicer must apply a "waterfall," i.e., a multiple-step process that is to be applied in a particular sequence, one step at a time, which here involves a five-step review of the terms of the loan to determine whether modification of one or more of those terms might reduce the monthly mortgage payment to no more than 31% of the borrower's gross monthly income. The five steps of the standard waterfall, in the order in which they are to be applied, are capitalization modification, interest rate reduction, term extension, principal forbearance, and principal forgiveness (*see* Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, version 3.2, ch 2, § 6.3 at 72 [Standard Modification Waterfall]; *see*

*also Edwards v Aurora Loan Servs., LLC*, 791 F Supp 2d at 149). Deviations from the standard waterfall are not precluded and, under certain circumstances, servicers may offer borrowers modifications more favorable than those required under HAMP (*see* Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, version 3.2, ch 2, § 6.3.6 at 74 [Variation from Standard Modification Waterfall]).

Moreover, "[a]ll loans that meet HAMP eligibility criteria and are either deemed to be in imminent default or delinquent as to two or more payments must be evaluated using a standardized NPV test that compares the NPV result for a modification to the NPV result for no modification" (Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, version 3.2, ch 2, § 7 at 80; *see Edwards v Aurora Loan Servs., LLC*, 791 F Supp 2d at 149). Using the standard modification waterfall, if the NPV test result under the modification scenario is greater than the NPV test result without modification, the result is deemed "positive" and the servicer "must offer the [HAMP] modification" (Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, version 3.2, ch 2, § 7 at 81). If the opposite occurs, the result is deemed "negative," and the servicer, with the express permission of the investor, has the discretion to offer the HAMP modification (*id.*). If, after a negative result, the servicer opts not to offer the borrower a modification, it "must send a Non-Approval Notice and consider the borrower for other foreclosure prevention options" (*id.*).

## CPLR 3408 (f) and Good Faith

We now turn from the federal response to the financial crisis, and address New York's response to the 2008 mortgage crisis. New York's response included the enactment of CPLR 3408, a remedial statute which required that, "in residential foreclosure actions involving the type of loans within the ambit of that section, in which the defendant was a resident of the subject property, the court would hold a mandatory conference for settlement discussions" (*Wells Fargo Bank, N.A. v Meyers*, 108 AD3d 9, 17 [2013]; *see* L 2008, ch 472; CPLR 3408).

In 2009, CPLR 3408 was amended by, among other things, requiring mandatory settlement conferences in mortgage foreclosure actions involving any home loan in which the defendant is a resident of the subject property—regardless of when the

home loan was made—and requiring both the plaintiff and defendant to negotiate in "good faith" to reach a resolution of the action, including, if possible, a loan modification (L 2009, ch 507, § 9, amending CPLR 3408 [a] and adding CPLR 3408 [f]). The Chief Administrator of the Courts thereafter promulgated 22 NYCRR 202.12-a, a regulation setting forth the rules and procedures governing CPLR 3408 settlement conferences (*see* 22 NYCRR 202.12-a [c] [4] [directing the court to "ensure that each party fulfills its obligation to negotiate in good faith"]). "The purpose of the good faith requirement [in CPLR 3408] is to ensure that both plaintiff and defendant are prepared to participate in a meaningful effort at the settlement conference to reach resolution" (Governor's Program Bill Mem No. 46R, Bill Jacket, L 2009, ch 507 at 11). While the aspirational goal of negotiations pursuant to CPLR 3408 is that the parties "reach a mutually agreeable resolution to help the defendant avoid losing his or her home" (CPLR 3408 [a]), the statute requires only that the parties enter into and conduct negotiations in good faith (*see Wells Fargo Bank, N.A. v Van Dyke*, 101 AD3d 638 [2012]). In its present form, CPLR 3408 provides, in pertinent part, as follows:

> "(a) In any residential foreclosure action involving a home loan . . . in which the defendant is a resident of the property subject to foreclosure, . . . the court shall hold a mandatory conference . . . for the purpose of holding settlement discussions pertaining to the relative rights and obligations of the parties under the mortgage loan documents, including, but not limited to determining whether the parties can reach a mutually agreeable resolution to help the defendant avoid losing his or her home, and evaluating the potential for a resolution in which payment schedules or amounts may be modified or other workout options may be agreed to, and for whatever other purposes the court deems appropriate. . . .

> "(f) Both the plaintiff and defendant shall negotiate *in good faith* to reach a mutually agreeable resolution, including a loan modification, if possible" (CPLR 3408 [a], [f] [emphasis added]).

A review of the legislative history does not reveal any discussion of the "good faith" standard envisioned by the legislature (*see* L 2009, ch 507).

On this appeal, the plaintiff essentially argues that a party to a mortgage foreclosure action can only be found to have violated the good-faith requirement of CPLR 3408 (f) when that party has engaged in egregious conduct such as would be necessary to support a finding of "bad faith" under the common-law. The plaintiff maintains that it did not engage in any egregious conduct such as gross negligence or intentional misconduct and, therefore, it satisfied the good-faith requirement of CPLR 3408 (f).

In the absence of a statutory definition of "good faith," we must first determine whether a lack of good faith should be measured by the common-law standard of bad faith or by a plaintiff's failure to comply with HAMP guidelines. No published decision appears to specifically define "good faith," as that term is employed in CPLR 3408 (f). In *Wells Fargo Bank, N.A. v Van Dyke* (101 AD3d at 638-639), the Appellate Division, First Department, rejected a plaintiff mortgagee's argument that compliance with the good faith requirement of CPLR 3408 is established "merely by proving the absence of fraud or malice on the part of the lender," and briefly addressed the issue of what constitutes "good faith" by noting that "[a]ny determination of good faith must be based on the totality of the circumstances" taking into account that CPLR 3408 is a remedial statute. However, the standard to apply in determining what constitutes a lack of good faith pursuant to CPLR 3408 (f) is a matter of first impression in this Court (*cf. IndyMac Bank, F.S.B. v Yano-Horoski*, 78 AD3d 895, 896 [2010] [the plaintiff did not challenge "bad faith" determination on appeal, but only contested the sanction of cancellation of the debt]).

A review of various trial-level court decisions shows that courts have not required a showing of intentional misconduct, malice, or gross negligence when determining whether a party has failed to negotiate in good faith as required by CPLR 3408 (f). For example, one court observed that good faith is a subjective concept, generally meaning honest, fair, and open dealings, and a "state of mind motivated by proper motive" (*HSBC Bank USA v McKenna*, 37 Misc 3d 885, 905 [Sup Ct, Kings County 2012] [internal quotation marks omitted]). Unreasonable, arbitrary, or unconscionable conduct is inconsistent with the statutory purpose of good faith negotiations aimed at achieving a resolution (*see id.* at 908). Several trial-level courts have found that, where a plaintiff lost financial documents, sent confusing and contradictory communications, inexcusably delayed a

modification decision, or denied requests for HAMP loan modifications without setting forth grounds, such conduct constituted a lack of good faith within the meaning of CPLR 3408 (f) (*see e.g. Wells Fargo Bank, N.A. v Ruggiero*, 39 Misc 3d 1233[A], 2013 NY Slip Op 50871[U] [Sup Ct, Kings County 2013] [finding it appropriate to sanction the plaintiff for its failure to act in good faith where the plaintiff, inter alia, provided conflicting information, refused to honor agreements, engaged in unexcused delay, imposed unexplained charges, made misrepresentations, and failed to deal honestly, fairly, and openly]; *HSBC Bank USA v McKenna*, 37 Misc 3d at 888, 898-899, 910 [accepting a referee's recommendation that the plaintiff be found to have failed to act in good faith where the plaintiff rejected a proposed short sale at a sum the plaintiff had previously stated was its minimum sale amount and, in dicta, advising that, in determining whether the plaintiff failed to act in good faith in rejecting a short sale proposal, the factors to be considered included the outstanding debt, the likely market movement, and whether a short sale would result in a greater yield than a public foreclosure auction]; *cf. Wells Fargo Bank, N.A. v Van Dyke*, 101 AD3d 638 [the defendants did not establish lack of good faith by the plaintiff where the defendants did not submit evidence supporting their claimed rental income]; *but see JP Morgan Chase Bank, N.A. v Ilardo*, 36 Misc 3d at 366, 378-380 [the plaintiff's conduct did not constitute a lack of good faith because an interim modification plan applied on a trial basis did not contractually obligate the plaintiff to provide a permanent HAMP loan modification to the defendants]). In addition, while we were not expressly called upon to decide the proper standard to apply in *Wells Fargo Bank, N.A. v Meyers* (108 AD3d 9), in that case we determined that the record supported the Supreme Court's finding that the mortgagee had failed to satisfy its obligation to negotiate in good faith without applying the common-law standard of bad faith.

The plaintiff nevertheless urges this Court to adopt the common-law standard of bad faith and hold that in determining whether a party failed to act in good faith during mandatory settlement negotiations pursuant to CPLR 3408, a court should consider only whether the party acted deliberately or recklessly in a manner that evinced gross disregard of, or conscious or knowing indifference to, another's rights. This standard for bad faith conduct has been articulated in various contexts to determine issues such as whether an insurance carrier may be

held liable for the alleged bad-faith failure to accept a settlement offer (*see Pavia v State Farm Mut. Auto. Ins. Co.*, 82 NY2d 445, 453-454 [1993] [to establish a prima facie case of bad faith, the plaintiff must establish that the insurer's conduct constituted a "gross disregard of the insured's interests—that is, a deliberate or reckless failure to place on equal footing the interests of its insureds with its own interests when considering a settlement offer" (internal quotation marks omitted)]); whether a "no-damage-for delay" clause in a contract may be enforced for delays allegedly actuated by bad faith (*see Kalisch-Jarcho, Inc. v City of New York*, 58 NY2d 377, 384-385 [1983] ["no-damage-for delay" clause will not exempt a party from liability for willful or gross negligence, intentional wrongdoing, fraudulent or malicious conduct]); and whether allegedly stolen bonds were taken in bad faith (*see Manufacturers & Traders Trust Co. v Sapowitch*, 296 NY 226, 229 [1947] [bad faith is "nothing less than guilty knowledge or willful ignorance"]).

Were this Court to adopt the plaintiff's proposed standard for determining whether a party failed to act in good faith, we would undermine the remedial purpose of CPLR 3408. The purpose of the statute is "to address the problem of mortgage foreclosures" by "help[ing] struggling homeowners without harming all consumers by inadvertently driving up the cost of credit or limiting the availability of legitimate credit" (Letter from Senator Farley, July 31, 2008, Bill Jacket, L 2008, ch 472 at 5), and "providing additional protections and foreclosure prevention opportunities for homeowners at risk of losing their homes" (Senate Introducer Mem in Support, Bill Jacket, L 2008, ch 472 at 7). To reiterate, "[t]he purpose of the good faith requirement [in CPLR 3408] is to ensure that both plaintiff and defendant are prepared to participate in a meaningful effort at the settlement conference to reach resolution" (Governor's Program Bill Mem No. 46R, Bill Jacket, L 2009, ch 507 at 11).

Therefore, we hold that the issue of whether a party failed to negotiate in "good faith" within the meaning of CPLR 3408 (f) should be determined by considering whether the totality of the circumstances demonstrates that the party's conduct did not constitute a meaningful effort at reaching a resolution. We reject the plaintiff's contention that, in order to establish a party's lack of good faith pursuant to CPLR 3408 (f), there must be a showing of gross disregard of, or conscious or knowing indifference to, another's rights. Such a determination would permit a party to obfuscate, delay, and prevent CPLR 3408 settlement

negotiations by acting negligently, but just short of deliberately, e.g., by carelessly providing misinformation and contradictory responses to inquiries, and by losing documentation. Our determination is consistent with the purpose of the statute, which provides that parties must negotiate in "good faith" in an effort to resolve the action, and that such resolution could include, "if possible," a loan modification (CPLR 3408 [f]; *see Wells Fargo Bank, N.A. v Meyers*, 108 AD3d at 11, 18, 20, 23; *Wells Fargo Bank, N.A. v Van Dyke*, 101 AD3d 638 [the defendants did not demonstrate that the plaintiff failed to act in good faith because nothing in CPLR 3408 requires a plaintiff to make the exact settlement offer desired by the defendants]; *HSBC Bank USA v McKenna*, 37 Misc 3d 885 [2012] [the plaintiff failed to act in good faith based upon, inter alia, a referee's finding that the plaintiff rejected an all-cash short sale offer]).

Where a plaintiff fails to expeditiously review submitted financial information, sends inconsistent and contradictory communications, and denies requests for a loan modification without adequate grounds, or, conversely, where a defendant fails to provide requested financial information or provides incomplete or misleading financial information, such conduct could constitute the failure to negotiate in good faith to reach a mutually agreeable resolution.

In this case, the totality of the circumstances supports the Supreme Court's determination that the plaintiff failed to act in good faith, as the plaintiff thwarted any reasonable opportunities to settle the action, thus contravening the purpose and intent of CPLR 3408. Sarmiento submitted his initial HAMP application on October 29, 2009, and provided updated financial documentation on November 18, 2009. Beginning on December 1, 2009, at the direction of the Court Attorney Referee, Sarmiento began placing $2,000 per month in an escrow fund, in part to demonstrate his ability to make modified monthly payments. On January 2, 2010, six weeks after receiving Sarmiento's complete HAMP application, the plaintiff denied the application on the erroneous ground that the property was not Sarmiento's primary residence.

Another month passed without a proper HAMP determination. On February 2, 2010, the plaintiff indicated that it needed a BPO to conduct an NPV test, a representation which suggested that Sarmiento's HAMP application had satisfied the five-step waterfall test. Nevertheless, two months later, on April 2, 2010, the plaintiff again denied Sarmiento's HAMP applica-

tion, apparently for failing to satisfy the waterfall test since the plaintiff claimed that modification could not result in a monthly payment equal to or less than 31% of Sarmiento's gross monthly income. However, the plaintiff apparently reached this conclusion using incorrect income data.

At the request of the Court Attorney Referee, Sarmiento submitted a second HAMP application on April 26, 2010. On May 13, 2010, the plaintiff denied the application, this time on the ground that the property was "not affordable." The plaintiff ignored Sarmiento's ensuing request for a more specific reason for denial and for the data that the plaintiff had used in conducting the NPV test.

On June 8, 2010, after Sarmiento sought the assistance of the HAMP support center, he was told that his HAMP application had been denied because of the escrow fund he had created at the direction of the Court Attorney Referee. This rationale, presumably relayed to the HAMP support center by the plaintiff, was a new ground for denial, and was inexplicable since the plaintiff was aware that the escrow fund existed at the direction of the Court Attorney Referee.

Nevertheless, despite the apparent denial of May 13, 2010, the plaintiff indicated, on July 1, 2010, that it was still reviewing Sarmiento's HAMP application. Despite having indicated in February 2010 that it would soon conduct an NPV test, the plaintiff stated that no NPV test had yet been conducted. On July 19, 2010, the plaintiff indicated that the defendant's HAMP application had been denied because of the creation and existence of the escrow fund.

Two months later, the plaintiff indicated that it again needed a BPO so that it could conduct an NPV test. Notably, the plaintiff had made an identical representation eight months earlier, and did not explain why it had not conducted the NPV test in February 2010. On October 5, 2010, the plaintiff offered Sarmiento a non-HAMP loan modification, while simultaneously indicating that his HAMP application was still under review. On the following day, the plaintiff again denied Sarmiento's HAMP application, this time on the ground that he was current on his mortgage. The record demonstrates that it was not until October 12, 2010, nearly one year after Sarmiento made his initial HAMP application, that the plaintiff finally conducted an NPV test, which was negative.

Any one of the plaintiff's various delays and miscommunications, considered in isolation, does not rise to the level of a lack

of good faith. Viewing the plaintiff's conduct in totality, however, we conclude that its conduct evinces a disregard for the settlement negotiation process that delayed and prevented any possible resolution of the action and, among other consequences, substantially increased the balance owed by Sarmiento on the subject loan. Although the plaintiff may ultimately be correct that Sarmiento is not entitled to a HAMP modification, the plaintiff's conduct during the settlement negotiation process makes it impossible to discern such a fact, as the plaintiff created an atmosphere of disorder and confusion that rendered it impossible for Sarmiento or the Supreme Court to rely upon the veracity of the grounds for the plaintiff's repeated denials of Sarmiento's HAMP application.

Therefore, the totality of the circumstances supports the Supreme Court's determination that the plaintiff failed to negotiate in good faith, in violation of CPLR 3408 (f) (*see Wells Fargo Bank, N.A. v Meyers*, 108 AD3d at 17).

Sanction

The plaintiff further argues that, even if it failed to act in good faith, the Supreme Court lacked the authority to sanction it absent express statutory or regulatory authority. In the plaintiff's view, CPLR 3408 (f) and 22 NYCRR 202.12-a (c) (4) require the parties to negotiate in good faith, but provide no mechanism to enforce that requirement. In order to address this particular contention, we must first look to our recent holding in *Wells Fargo Bank, N.A. v Meyers* (108 AD3d 9 [2013]).

In *Meyers*, the plaintiff in a foreclosure action had, among other things, commenced the action even though its loan modification proposal was pending, denied a permanent loan modification based on the defendants' purported debt-to-income ratio without submitting evidence of its calculations, and provided conflicting information regarding its denials of requests for a loan modification. This Court observed that, upon finding that foreclosing plaintiffs failed to negotiate in good faith pursuant to CPLR 3408 (f), the trial-level courts have imposed a variety of sanctions, including barring them from collecting interest, legal fees, and expenses, imposing exemplary damages against them, staying the proceedings, imposing a monetary sanction pursuant to 22 NYCRR part 130, and vacating the judgment of foreclosure and sale and cancelling the note and mortgage (*see Wells Fargo Bank, N.A. v Meyers*, 108 AD3d at 20-21). We noted that, save for our determination in *IndyMac Bank, F.S.B. v Yano-Horoski* (78 AD3d 895 [2010]), in which we

reversed the severe sanction of cancellation of the note and mortgage, based on the plaintiff's failure to negotiate in good faith as required by CPLR 3408 (f), this Court had not otherwise reviewed the propriety of other means of enforcing the good-faith negotiation requirement of CPLR 3408 (f).

In *Meyers*, this Court determined that there was no basis to disturb the Supreme Court's finding, made after a hearing, that the plaintiff failed to negotiate in good faith, in violation of CPLR 3408 (f). While acknowledging that CPLR 3408 (f) does not set forth a specific remedy for a party's failure to negotiate in good faith (*see Wells Fargo Bank, N.A. v Meyers*, 108 AD3d at 19; Hon. Mark C. Dillon, *The Newly-Enacted CPLR 3408 for Easing the Mortgage Foreclosure Crisis: Very Good Steps, but not Legislatively Perfect*, 30 Pace L Rev 855, 875 [Spring 2010]), this Court found that the particular remedy imposed by the Supreme Court—compelling the plaintiff to permanently abide by the terms of a HAMP trial loan modification—was "unauthorized and inappropriate" (*Wells Fargo Bank, N.A. v Meyers*, 108 AD3d at 21). This Court did not rule on the possibility of other remedies for a violation of the good-faith negotiation requirement set forth in CPLR 3408 (f) and cautioned that the courts may not rewrite the loan agreements into which the parties freely entered merely upon finding that one party failed to satisfy its obligation to negotiate in good faith pursuant to CPLR 3408 (f) (*see id.*).

Contrary to the plaintiff's contention, the Supreme Court did not lack authority to impose a sanction for the plaintiff's failure to negotiate in good faith pursuant to CPLR 3408 (f). This Court has specifically held that the Supreme Court has "authority to impose a sanction or remedy in the event it determined . . . that [a] plaintiff had failed to negotiate in good faith in the mandatory foreclosure settlement conferences" (*Bank of Am., N.A. v Lucido*, 114 AD3d 714, 715 [2014], citing *Wells Fargo Bank, N.A. v Meyers*, 108 AD3d at 11). Although CPLR 3408 is silent as to the sanctions or remedies that may be employed for violation of the good faith negotiation requirement, "[i]n the absence of a specifically authorized sanction or remedy in the statutory scheme, the courts must employ appropriate, permissible, and authorized remedies, tailored to the circumstances of each given case" (*Wells Fargo Bank, N.A. v Meyers*, 108 AD3d at 23).

Notably, unlike the borrower in *Meyers* (108 AD3d 9), Sarmiento specifically moved to impose the sanctions ultimately

imposed by the Supreme Court, based upon the court's finding that the plaintiff violated the good faith requirement of CPLR 3408 (f). Therefore, the plaintiff was on notice that the Supreme Court would entertain such a remedy.

We also note that in contrast to *Meyers*, the plaintiff does not argue that the sanctions actually imposed in the instant case were excessive or improvident. Therefore, the propriety of the particular sanctions imposed herein is not before us. To the extent that the arguments raised in the plaintiff's reply brief may be viewed as a challenge to the propriety of the sanction imposed by the Supreme Court in this case, these arguments are not properly before us since they are raised for the first time in a reply brief, to which Sarmiento had no opportunity to respond (*see Monadnock Constr., Inc. v DiFama Concrete, Inc.,* 70 AD3d 906 [2010]; *Congel v Malfitano,* 61 AD3d 809 [2009]; *Borbeck v Hercules Constr. Corp.,* 48 AD3d 498 [2008]).

We are cognizant that, in a foreclosure action, "[t]he court's role is limited to interpretation and enforcement of the terms agreed to by the parties, and the court may not rewrite the contract or impose additional terms which the parties failed to insert" (*131 Heartland Blvd. Corp. v C.J. Jon Corp.,* 82 AD3d 1188, 1189 [2011]; *see Wells Fargo Bank, N.A. v Meyers,* 108 AD3d 9; *Maser Consulting, P.A. v Viola Park Realty, LLC,* 91 AD3d 836, 837 [2012]). Thus, in fashioning a remedy for a violation of the good-faith negotiation requirement set forth in CPLR 3408 (f), courts should be mindful not to rewrite the contract at issue or impose contractual terms which were not agreed to by the parties. As the nature of the sanction in this case is unchallenged, our determination herein should not be construed as a deviation from the above-stated principle.

Accordingly, the order is affirmed insofar as appealed from.

RIVERA, J.P., SKELOS and LOTT, JJ., concur.

Ordered that the order is affirmed insofar as appealed from, with costs.