[6 NYS3d 393]

CitiMortgage, Inc., Plaintiff, v Andre Sultan, Also Known as Andre Sulton and Another, et al., Defendants.

Supreme Court, Kings County, October 29, 2014

628

**APPEARANCES OF COUNSEL**

*Sweeney Gallo Reich & Bolz LLP* (*Robert Link* of counsel) for plaintiff.

*Law Office of Carl E. Person* (*Jorge Delgado* of counsel) for Andre Sultan, Also Known as Andre Sulton and another, defendant.

**OPINION OF THE COURT**

LARRY D. MARTIN, J.

Plaintiff CitiMortgage, Inc. (plaintiff or Citi) moves this court for an order permitting plaintiff to voluntarily discontinue the instant action without prejudice. Defendant cross-moves for an order dismissing the action with prejudice, cancellation of the notice of pendency for failing to prosecute the action in good faith, and reimbursement of payments defendant made to plaintiff under the theory of unjust enrichment. The action was also referred to this Part pursuant to the directive of Referee Noreen Soto-Fier, Esq. dated June 28, 2013 for a hearing on bad faith (the directive).

## Background

On or about March 26, 2008, the defendant borrower, Andre Sulton (defendant or borrower or Sulton), executed a note in

the amount of $618,750 in favor of Carnegie Mortgage LLC, simultaneously with a mortgage securing the premises located at 2105 Bergen Street in Brooklyn, New York, which names Mortgage Electronic Recording System, Inc. (MERS) as nominee for the lender, Carnegie. The copy of the note submitted with plaintiff's opposition papers has an undated allonge, endorsing the note to US Mortgage Corporation, and another undated allonge, endorsing the note to plaintiff Citi. Plaintiff claims that the note was allegedly received on or about April 21, 2008, and the mortgage was assigned to Citi two years later by written assignment from MERS dated September 8, 2010.

It is not clear when defendant initially defaulted on this obligation—but in late 2009, plaintiff and defendant apparently discussed foreclosure alternatives. Particularly, plaintiff offered a Home Affordable Modification Program trial period plan, with an effective date of January 1, 2010 (the HAMP trial), which defendant signed on December 20, 2009 (plaintiff's affirmation in opposition to defendant's motion to dismiss and reply in support of plaintiff's motion to discontinue without prejudice dated Dec. 23, 2013 [hereinafter Link opp], exhibit D). Defendant alleges (and plaintiff does not dispute) that, in accordance with the agreement, defendant made seven payments in the amount of $2,775.50 beginning November 23, 2009 through April 27, 2010, totaling $19,468.50.[1] Defendant then received a letter dated May 21, 2010, stating that the loan was in default. Defendant was notified thereafter, by letter dated September 3, 2010, that the HAMP trial was not approved because the property is not occupied as the owner's primary residence.

Plaintiff then commenced this action on or about September 21, 2010. The verified complaint alleges that the defendant defaulted on the note by failing to pay a monthly payment due on February 1, 2010.[2] Filings made with the County Clerk indicate that process was served on defendant at his residence

---

1. This total includes the $20 "service fee" plaintiff charged on the payments made on March 26, 2010 and April 27, 2010 (aff of Andre Sulton dated Nov. 15, 2013 [hereinafter Sulton aff] ¶ 3).

2. The complaint, although verified, is not dispositive as evidence of the date of default because it is verified by counsel who may not have personal knowledge of the facts (see Indig v Finkelstein, 23 NY2d 728 [1968]; Finnegan v Sheahan, 269 AD2d 491 [2d Dept 2000]; Mullins v DiLorenzo, 199 AD2d 218 [1st Dept 1993]). Additionally, this alleged date of default conflicts with the party affidavit submitted with plaintiff's opposition to defendant's

(not the subject mortgaged premises, which is used as a residential investment property). Defendant, then appearing pro se, filed a verified answer dated October 1, 2010, asserting general denials, and did not assert any defenses or counterclaims.

The case lay dormant for about 1½ years. Plaintiff filed a request for judicial intervention (RJI) on April 10, 2012, triggering an appearance in the Foreclosure Pre-Settlement Conference Part for screening on July 17, 2012. The first conference in the Foreclosure Settlement Conference Part (FSCP) took place on October 23, 2012.[3] Plaintiff alleges that he made an application to remove the matter to an IAS part, which was allegedly rejected over counsel's objection.[4] At oral argument, plaintiff similarly alleges that, at this first FSCP conference, he asked defendant Sulton if he would consent to a discontinuance of the entire action without prejudice, which was allegedly rejected, and then told the Referee that he wanted to discontinue the action, which was similarly allegedly rejected (tr of oral argument and hearing held Jan. 14, 2014 at 8, line 6 through 9, line 3). Defendant alleges that he went to the conference and asked plaintiff's counsel to see the front and back of the original note; he also submitted his own proposal to modify the loan dated October 23, 2012 (Sulton aff, exhibit G). Additionally, defendant alleges that he sent the first of two Qualified Written Requests (QWR), which indicated that the request was being made pursuant to the "Federal Servicer Act, which is a part of the Real Estate Settlement Procedures Act, 12 U.S.C. 2605(e)" (reply aff of Andre Sulton dated Jan. 13, 2014 [hereinafter Sulton reply] ¶ 4). The first request asked for, inter alia, a "complete and itemized statement of the loan history from the date of the loan to the date of this letter" and

cross motion, which states that the borrower defaulted and "the loan is due for April 1, 2010" (aff of Matthew Sinner, Business Operations Analyst of CitiMortgage, Inc. dated Dec. 20, 2013 [hereinafter Sinner aff] ¶ 9).

3. Shortly before the first conference and beginning around October 1, 2012, defendant began receiving letters from CitiBank stating that the bank could no longer service his account. Defendant received eight of these letters, which were allegedly never explained to him. While not entirely clear, it is unlikely that CitiBank's closing of defendant's accounts is relevant to the instant loan or this CitiMortgage foreclosure action.

4. However, in an email from Mr. Link to Mr. Delgado dated August 1, 2013, Mr. Link acknowledges that conferencing in the FSCP may be proper, stating: "Additionally, the matter was held in the Settlement Conference Part over my objection and pursuant to the Kings County Foreclosure rules which expand the scope of CPLR 3408 to investment properties" (plaintiff's affirmation in support of CPLR 3408 compliance dated Nov. 18, 2013, exhibit P).

was sent to plaintiff's counsel's firm, Sweeney, Gallo, Reich & Bolz LLP,[5] on October 23, 2012 (Sulton reply, exhibit A). Defendant alleges that plaintiff's counsel did not show him the note, and he did not receive any response to the QWR. It is unclear whether Citi responded to defendant's proposal, but then defendant received another trial modification plan and agreement on or about December 20, 2012 (the second mod).

The next conference was held on January 7, 2013. Defendant signed the second mod agreement the day before, on January 6, 2013, and advised plaintiff and the Referee at the conference that a notary public would not sign the acknowledgment section because it was on a separate page that was immediately after the page where the borrower signed. Defendant alleges that he requested an accounting of the previous HAMP trial payments at this conference because he did not see those payments reflected in the second mod agreement.

Defendant emailed counsel for plaintiff, Mr. Robert Link of Sweeney Gallo, about the second mod, and Mr. Link advised that the bank received the contract, but that it would have to be notarized (plaintiff's affirmation in support of CPLR 3408 compliance dated Nov. 18, 2013 [hereinafter Link 3408 affirmation], exhibit G). Defendant then had the agreement notarized on January 30, 2013 with the notary's signature and stamp placed next to the borrower's signature in an empty space on the same page; the following acknowledgment page was left unsigned. He sent it to Mr. Link by email dated January 31, 2013. Mr. Link replied on the same day,[6] stating "Thanks . . . but I don't think they can accept it like this" and noted that the notary's signature has to be on the same date as the borrower's, to show that the notary witnessed the borrower sign; he additionally stated that the separate notary page (the acknowledgment page) would have to be filled out (Link 3408 affirmation, exhibit H). Mr. Link then sent another modification agreement the next day, February 1, 2013, and advised defendant to fill it out in accordance with the instructions (Link 3408 affirmation, exhibit I).

---

**5.** The court notes that since the instant bad faith determination and motions were fully submitted to the court on January 14, 2014, a consent to change attorneys dated January 11, 2014 was filed in the Kings County Clerk's Office on February 21, 2014, substituting Akerman LLP instead of Sweeney Gallo. For purposes of this decision, any and all references to plaintiff's "counsel" is intended to refer to Sweeney Gallo.

**6.** The court notes that, strangely, Mr. Link's response appears to have been sent at 2:27 p.m., a time *before* defendant emailed him, which appears to be 2:31 p.m. (Link 3408 affirmation, exhibit H).

Meanwhile, in accordance with the second mod agreement, defendant made four payments in the amount of $3,552.80 beginning January 22, 2013 with the last payment made April 29, 2013—totaling $14,211.20. Additionally, defendant sent a second QWR directly to plaintiff Citi on February 20, 2013 with a copy of the first request, indicating that the first QWR was not answered sufficiently or timely. In this request, Mr. Sulton specifically added a request to see the front and back of the original note (Sulton reply, exhibit B), and alleges he did not receive any response.

Defendant appeared with counsel, Mr. Jorge Delgado, Esq. of the Law Office of Carl E. Person, at the next conference held March 1, 2013. Defendant claims that no accounting of the previous HAMP trial payments was given at that time. According to defendant, counsel for plaintiff allegedly represented that they would present the notarized agreement to Citi for its consideration, but could not guarantee that Citi would accept it. Additionally, Mr. Delgado, recounting his first conference in a letter, wrote that counsel appearing on behalf of Mr. Link's office stated the borrower's signature page was unacceptable; and then advised that this issue would be further investigated (Link 3408 affirmation, exhibit P). By contrast, Mr. Link's attorney affirmation alleges he "very clearly asked Mr. Delgado whether the notary format, as previously described as problematic, needed to be changed to facilitate a settlement. In response, Mr. Delgado unequivocally stated the notary page was no longer an issue" (Link 3408 affirmation ¶ 21).[7] Further, Mr. Link avers that, at this conference, Mr. Delgado only raised a concern about indemnification language in section L of the second mod.

After the March 1, 2013 conference, the parties exchanged email correspondence about the status of the modification. On April 18, 2013, Mr. Delgado emailed Mr. Link asking whether the modification agreement is in place; and requested a

---

7. Even though Mr. Link submits that he, personally, spoke to Mr. Delgado at this conference, and appears to recite a specific statement from Mr. Delgado at that conference, the court is unsure whether Mr. Link did, in fact, personally appear as he insinuates. Mr. Delgado's letter dated August 20, 2013 which outlined a number of hurdles to the settlement, recounted that counsel appeared on behalf of Mr. Link's office. Additionally, plaintiff submitted email correspondence from April 18, 2013 (after the Mar. 1st conference) whereby Mr. Delgado introduced himself to Mr. Link, and Mr. Link responded that he was "glad that [they were] finally in contact" (Link 3408 affirmation, exhibit K).

breakdown of his client's payment history (Link 3408 affirmation, exhibit J). Mr. Link replied that he asked defendant for his attorney's contact information over a month ago and is glad they are finally in contact; he also stated that the bank never received the signed agreement (Link 3408 affirmation, exhibit K). Mr. Delgado resends the signed agreement, asking for plaintiff to confirm that the modification is in place, along with a notice of appearance; Mr. Link replied that the acknowledgment page is not signed and stated "I thought this was no longer an issue?" (Link 3408 affirmation, exhibit L).

At the next conference on May 21, 2013, defendant claims that plaintiff, once more, did not provide an accounting of the previous payments. Defendant also claims that plaintiff's counsel allegedly stated it was still unable to confirm that Citi would accept the signature page as tendered. Plaintiff, however, alleges that counsel for Citi "appeared to explain that the properly signed and notarized Modification Agreement had not been received from the Defendant" (Link 3408 affirmation ¶ 29). Plaintiff also alleges that Mr. Delgado raised the separate-acknowledgment-page issue for the very first time (Link 3408 affirmation ¶ 30). The Referee's directive stated that this conference was "adjourned to give plaintiff the opportunity to decide whether to accept the notarized signature without the acknowledgment or to re-draft the agreement" (directive at 2).

The next and final FSCP conference was held on June 28, 2013, at which time the Referee issued the directive, referring the matter to this IAS Part for a hearing on bad faith and appropriate sanctions, due to plaintiff's unexcused five-month delay in finalizing the modification. The directive stated, "At today's conference, plaintiff's counsel indicated that her client has agreed to re-draft the document, but the draft is being reviewed by the Legal Department" (directive at 2). Mr. Link's affirmation states that at this final FSCP conference, "Plaintiff's counsel appeared to explain that CitiMortgage was unable to change the format of their Modification Agreement to accommodate the Defendant" (Link 3408 affirmation ¶ 31). Mr. Link provided another version of that conference at oral argument, stating that, after the conference on May 21, 2013, he brought up the issue with his client, Citi, who was "unable to address that concern" in time before the next conference on June 28, 2013, apparently because "[i]t was a very difficult thing to do" within five weeks (tr at 11, line 20 through 12, line 16).

By letter dated July 2, 2013, counsel for defendant, Mr. Carl Person, Esq. of the Law Office of Carl E. Person, wrote to Mr. Link, noting that previous requests were made, but again asked for "a full accounting of each and every debit and credit to any account related to this loan" (reply affirmation of counsel in further support of defendant Sulton's cross motion dated Jan. 12, 2014, exhibit B).

On July 3, 2013 defendant claims he received a revised second mod agreement, with the borrower's signature line on the same page as the notary's. While defendant was pleased to see the revised document, he alleges that he and his counsel were waiting for an accurate and legible accounting of what happened to his HAMP trial payments before the revised second mod could be signed.

Meanwhile, counsel for the parties were exchanging email correspondence: on July 3, 2013, Mr. Link emailed Mr. Delgado a document (not attached to the exhibit), which was supposed to be an accounting, showing $17,734.20 being held in an "unapplied funds account" (Link 3408 affirmation, exhibit P). Mr. Delgado replied that he was unable to tell how this document showed what Mr. Link claimed it showed; he also pointed out that Mr. Sulton paid $19,468.50 for the HAMP trial—leaving a difference of $1,734.48 still unaccounted for. The parties agreed to continue to try to work out a settlement, but Mr. Delgado reaffirmed that there will not be a settlement until the parties clearly understand what became of the defendant's previous payments. Mr. Delgado also requested a written confirmation signed by Citi stating how the previous payments have been or will be applied (Link 3408 affirmation, exhibit P [Mr. Delgado's emails dated July 5, 2013 at 3:41 p.m.; July 5, 2013 at 4:45 p.m.; Aug. 8, 2013]).

The record before the court indicates that, after Mr. Delgado's email to Mr. Link dated August 8, 2013, again requesting an accounting and a written confirmation as to how the previous payments had been applied, on August 16, Mr. Link emailed Mr. Delgado asking, "were you able to work something out w/ your client. Again, I need to resolve this as soon as possible" (Link 3408 affirmation, exhibit P).

By letter dated August 20, 2013, Mr. Delgado explained defendant's position in further detail and outlined the issues that required resolution between the parties before the second mod could be signed on their end. The letter, once more, requested an accounting of the mortgage since acceleration, with

interests, fees, costs, etc., and of the trial payments; it pointed out that defendant had previously requested an accurate and legible history of the HAMP trial and the subject second mod trial payments, and indicated they would be content with "a 'written representation from [plaintiff Citi]' explaining how 'it will apply the $33,679.70 in payments' " (reply affirmation of cocounsel in further support of defendant Sulton's cross motion dated Jan. 12, 2014 ¶ 10, quoting *id.*, exhibit B). Further, Mr. Delgado suggested that the second mod's effective date should be pushed off until September or October, in order for the parties to resolve these issues—without paying the retroactive payments since his last payment on April 29, 2013 until the date of the new agreement. Mr. Delgado also, presumably for the first time, raised concerns about other terms and/or issues related to the second mod agreement: one being a request to consider the $128,149.16 reduction in principal balance as a credit, rather than debt forgiveness, for tax purposes; the second concerned language in section 4 (N), in which the borrower gives MERS the right to "take certain actions required of the Lender including, but not limited to, releasing and canceling the mortgage loan"; and, lastly, Mr. Delgado requested an explanation of why CitiBank could no longer service defendant's accounts (*see* n 3, *supra*).

Mr. Link responded to the letter by email on August 26, 2013, claiming that most of these issues were never brought up before. With respect to an accounting, Mr. Link claims that it had all "been previously provided and are memorialized in the loan agreement" and offered updated figures; he also indicated he would sign a stipulation that the previous HAMP trial payments would be applied to the principal balance, and did not understand why the figure changed to $33,679.70 from $19,468.50.[8] With respect to extending the effective date, Mr. Link claims that he only "received the improperly notarized form" from an April 24, 2013 email; that the notary page was not an issue; and that retroactive payments are required under the National Mortgage Settlement. With respect to the new issues, Mr. Link stated that the lender has to issue a 1099-C for tax purposes because the debt is not secured by the borrower's primary residence; he is not aware of any law that prohibits the language regarding MERS; and he indicated that CitiBank

---

8. The amount of $19,468.50 constitutes the total of HAMP trial payments; where as the $33,679.70 constitutes the total amount of payments made for the HAMP trial as well as the second mod.

is a separate entity from CitiMortgage and he does not have any information on the personal bank account closures. Mr. Link concluded with the following:

> "Finally, regardless of whether I can settle the cases, my foreclosure is defective and I need to discontinue the action and cancel the Lis Pendens. As your client prepared a pro se Answer, I need his signature to proceed with the discontinuance. If he does not consent to discontinue, I have no option but to file a motion to discontinue for the earliest possible return date" (Link 3408 affirmation, exhibit P).

Meanwhile, the following took place outside of the settlement negotiations between counsel: on August 13, 2013, defendant claims he received the original, problematic second mod agreement (with the borrower's and notary's signature lines on separate pages) from Citi. Mr. Delgado noted this in the August 20, 2013 letter (*supra*), and in plaintiff's response, Mr. Link stated that defendant should disregard that correspondence.

Then on or about August 14, defendant received an RJI in another, separate action, *Chase Home Finance, LLC v Sulton* (Sup Ct, Kings County, King, J., index No. 21758/2010 [the *Chase* action]), which was filed on August 19, 2013. It was then that defendant claims he realized that this action concerns the same note and mortgage as in the *Chase* action. Chase Home Finance, LLC had filed its own notice of pendency, and summons and complaint on or about September 1, 2010, seeking to foreclose on the same lien, on the same premises.[9] Defendant, acting pro se, responded to that complaint by way of an answer filed September 15, 2010. The answer indicates that defendant mistakenly believed his answer was responding to an action to foreclose on the premises located at *2095* Bergen Street; when in fact it is for the same premises sub judice, *2105* Bergen Street. The *Chase* action is currently pending before Justice Kathy J. King, Conference Part 64.

Then defendant personally received a letter dated August 16, 2013 from Sweeney Gallo, with enclosed stipulations to discontinue the action and to cancel the notice of pendency. The letter states:

---

**9.** According to an Automated City Register Information System (ACRIS) search, MERS assigned a mortgage to Chase on August 13, 2010, which was recorded on September 21, 2010. MERS also assigned a mortgage to Citi on September 8, 2010, which was recorded on September 29, 2010.

"Dear Sir/Madam:

"With respect to the above-referenced foreclosure matter, you're answering on behalf of the defendant, ANDRE SULTON and requested notice of discontinuance of the action.

"Kindly execute the enclosure and return the same to my attention as quickly as possible. We provide herewith a self-addressed, stamped envelope for your convenience.

"Please return as soon as possible as this matter is time sensitive" (Sulton aff, exhibit S).

The letter was signed by a paralegal, Aditya Bissoonauth. It is undisputed that defendant did not request a notice or stipulation to discontinue; nor that defendant was actually represented by counsel at that time.

After the directive was issued on the last FSCP conference date, June 28, 2013, the case was referred to this IAS Part 41 for a bad faith hearing and conference on August 13, 2013, which was adjourned to September 10, 2013. At this conference, plaintiff stated that it intended to discontinue the action and filed the instant motion the same day. Additionally, plaintiff's counsel represented to defendant's counsel and the assistant law clerk that the correspondence sent to defendant, the original second mod on August 13, 2013 and the August 16, 2013 letter enclosing unsolicited stipulations to discontinue, were both inadvertent errors.

Defendant then made the instant cross motion to dismiss with prejudice, cancel the notice of pendency due to plaintiff's failure to prosecute the action in good faith, and for an order reimbursing defendant for the payments made towards the HAMP trial and the second mod trials in the amount of $33,679.70. Oral arguments on the motions were held with the hearing on bad faith on January 14, 2014.

## Analysis

### Plaintiff's Motion to Discontinue

A plaintiff may discontinue its action voluntarily upon stipulation by the parties or by order of the court (see CPLR 3217 [b]). Upon motion for such order, the decision as to whether to grant or deny the motion is within the sound discretion of the court, and should be granted absent special circumstances (*Tucker v Tucker*, 55 NY2d 378 [1982]; *GMAC Mtge., LLC v Bisceglie*, 109 AD3d 874 [2d Dept 2013]). "Particular prejudice

to the defendant or other improper consequences flowing from discontinuance may however make denial of discontinuance permissible" (*Tucker*, 55 NY2d at 383); this "includ[es] an adverse determination of the court or the consequences of a potentially adverse determination" (*Bisceglie*, 109 AD3d at 876 [citations omitted]). Courts should look at "the prejudice that may accrue to others in, or even outside of, the litigation. The court should also consider the stage that the litigation has reached. The further it has gone the more suspect is the plaintiff's endeavor to discontinue" (David D. Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, C3217:12).

In cases where a plaintiff is not forthcoming with its reason(s) for discontinuing and the failure to state what the party will do thereafter (if/when it recommences), it can generally be inferred that there are ulterior motives involved and/or that a dismissal without prejudice would result in improper consequences. Consequently, it is more likely that a motion to discontinue will be denied under these circumstances (*see Bisceglie*, 109 AD3d at 875 [motion denied where plaintiff claimed it could not "move forward with the foreclosure 'due to an issue with the default notification', *without specifying what the 'issue' is*"]; *Bank of Am., N.A. v Glickman*, 43 Misc 3d 1206[A], 2014 NY Slip Op 50509[U], *3 [Sup Ct, Saratoga County 2014] [plaintiff's motion denied solely "based upon the plaintiff's failure to specify what, if any, action it intends to take concerning the mortgage and property"]; *US Bank N.A. v Gioia*, 42 Misc 3d 947, 951 [Sup Ct, Queens County 2013] ["The Bank has failed to provide a reason for discontinuance other than stating it would be in the interests of all parties"]; *see also Tucker*, 55 NY2d at 384 and n 2 [suggesting a conditional order upon the hypothetical scenario "in which the plaintiff is less open in disclosing the objective behind his or her motion to discontinue, or even affirmatively masks its ulterior purpose"]). Here, what Citi intends to do upon discontinuance is not known.[10]

Plaintiff's counsel affirmed that the motion was being made as a "precautionary measure," stating "It has been concluded that certain information, contained in an affidavit filed in this case, may not have been verified properly" (attorney affirmation of Robert Link, Esq. in support of plaintiff's motion to

---

10. However, during the hearing, Mr. Link stated, without definitively representing, that he "imagine[s] [Citi] would [recommence], because they have a valid lien, and they're not getting paid" (tr at 17, lines 17-19).

discontinue dated Sept. 9, 2013 ¶ 9). At oral argument, Mr. Link further explained that an "affidavit that was provided in support of the special RJI" was at issue. Mr. Link alleged that Citi identified an issue with its "verification process of affidavits," which Citi has now corrected because of purported new requirements from the National Mortgage Settlement. Mr. Link went on to note that "[a] number of cases throughout the state have been recommenced because the standards for verification have improved significantly. That's exactly what we're doing" (tr at 34, lines 14-17). However, the specific affidavit at issue was never identified and the only affidavits submitted with the RJI are affidavits of service.[11] The court cannot speculate as to what is the exact issue with the unidentified affidavit purportedly submitted with the special RJI. And without knowing whether the alleged defect could be corrected or disregarded (*see* CPLR 2001), nunc pro tunc or otherwise, it is not clear whether the defect (if one exists) is prejudicial to the defendant, or whether it would produce an adverse outcome for plaintiff. The only other evidence providing an indication as to the reasoning behind plaintiff's motion is found in an email exchanged between Mr. Link and Mr. Delgado (Link 3408 affirmation, exhibit P). In responding to defendant's letter describing outstanding issues to settlement and the second mod, plaintiff writes "Finally, regardless of whether I can settle the cases, my foreclosure is defective and I need to discontinue the action and cancel the Lis Pendens." From plaintiff's own submissions, the court can find that plaintiff is seeking to avoid a potentially adverse determination, warranting denial of its motion (*see e.g. Glickman*, 2014 NY Slip Op 50509[U]).

The likelihood that plaintiff is seeking to avoid a potentially adverse outcome is made stronger with defendant's arguments in opposition and in support of its cross motion to dismiss. Defendant argues that plaintiff lacks standing and that it cannot demonstrate that it held the note and mortgage at the time of commencement. This court is hard-pressed to disagree, as plaintiff has failed to rebut the argument with sufficient evidence demonstrating that it held the note on or before September 21, 2010. Plaintiff alleges that the "Original Note

---

11. Indeed, plaintiff has not submitted a party affidavit, attesting to the accuracy and merits of its claims, in accordance with form B of Administrative Order of the Chief Administrative Judge of the Courts dated March 2, 2011 (AO/431/11); nor the CPLR 2106 attorney affirmation, form A of the same, which, in this case, would be required if/when plaintiff moves for an order of reference.

was received on April 21, 2008, prior to the commencement of the action on September 21, 2010. See Exhibit B" (Link opp ¶ 20 [emphasis omitted]). As proof, plaintiff submits a party affidavit (*see* n 2, *supra*), which describes exhibit B as the "Correspondence Log" which is supposed to show a note was received on April 21, 2008. It is a one-page computer-screen printout, with many unexplained acronyms, numbers and dates—none of which resemble the date of April 21, 2008 or "04/21/2008" as it would appear therein. Seeing as though this may be the only "evidence" that plaintiff alleged it had to prove it had the right to commence and maintain this action, plaintiff submitted a "Supplemental Affirmation to Correct and Amend Exhibit Annexed to Plaintiff's Opposition to the Motion to Dismiss With Prejudice" dated January 14, 2014 (the date of oral argument). This "Supplemental Affirmation," however, was submitted without leave of the court and without good cause shown—thus, such affirmation will be disregarded (CPLR 2214 [c]; *Ostrov v Rozbruch*, 91 AD3d 147, 155 [1st Dept 2012] ["Supplemental affirmations however, should be sparingly used to clarify limited issues, and should not be utilized as a matter of course to correct deficiencies in a party's moving or answering papers"]; *Flores v Stankiewicz*, 35 AD3d 804, 805 [2d Dept 2006] ["The Supreme Court should not have considered the plaintiff's alleged documentary proof as it was submitted in counsel's self-entitled 'Supplemental Affirmation in Opposition,' which was, in effect, an improper sur-reply"]).[12] At the hearing, Mr. Link represented to the court that he had the original note with him, in his bag (tr at 16, lines 8-10). Upon presentation for opposing counsel and the court's review, he later clarifies that it is a *copy* of the original note (tr at 16, lines 16-17)—which still does not establish plaintiff's possession of it over three years ago in 2010. Due to the fact that plaintiff cannot show its right to foreclose, coupled with its inability to clearly establish a date of defendant's default (*see JP Morgan Chase Bank, N.A. v RADS Group, Inc.*, 88 AD3d 766 [2d Dept 2011]), plaintiff's motion should be denied (*cf. Great W. Bank v Terio*, 200 AD2d 608, 609 [2d Dept 1994] [because,

**12.** However, the court ruled at the hearing plaintiff could submit additional papers for the limited purpose of addressing defendant's allegation that Mr. Link and/or Sweeney Gallo violated the Rules of Professional Conduct (22 NYCRR 1200.0) rule 4.2 (a), which was raised in defendant's reply papers (discussed infra). Plaintiff later submitted plaintiff's surreply to defendant's motion to dismiss with prejudice dated January 22, 2014 (hereinafter Link surreply).

inter alia, "(i)t is undisputed that the defendants defaulted on their mortgage payments and it is clear that the plaintiff had a right to foreclose on the subject property" the court found no "special circumstances" standing in the way of a voluntary discontinuance]).

Further, even if plaintiff had some sort of right to commence the action on or about September 21, 2010, it is possible that its interests would be subordinate to Chase's, who filed its action and notice of pendency before plaintiff Citi (see *Fleet Mtge. Corp. v Nieves*, 272 AD2d 435 [2d Dept 2000]; cf. *Household Fin. Realty Corp. of N.Y. v Emanuel*, 2 AD3d 192 [1st Dept 2003]). An ACRIS property search shows that MERS assigned a mortgage to Chase on August 13, 2010, which was recorded on September 21, 2010; a few days later, MERS assigned a mortgage to Citi on September 8, 2010, which was recorded on September 29, 2010. While the court cannot make any determination on the record before it without Chase, it is possible that Citi had constructive notice of Chase's interest, as Chase recorded its assignment first, and Citi had possible constructive notice of its foreclosure action by Chase's filings made with the Kings County Clerk's Office on September 1, 2010. The *Chase* action had been dormant for a few years, until an RJI was filed on August 19, 2013. Coincidentally, days later on August 26, 2013, Mr. Link elicited plaintiff's intention to discontinue the Citi action in his email to Mr. Delgado, as quoted, supra (Link 3408 affirmation, exhibit P ["my foreclosure is defective and I need to discontinue the action"]). Then plaintiff's counsel came to the conference in this IAS Part on September 10, 2013 and notified the court and the parties of its motion to discontinue. For the reasons stated above, plaintiff's motion is denied.

Defendant's Cross Motion

At the outset, it must be noted that neither the defense of standing nor a claim for unjust enrichment is pleaded in defendant's answer. The defense of standing is waived if not asserted in an answer or pre-answer motion to dismiss (*Wells Fargo Bank Minn., N.A. v Mastropaolo*, 42 AD3d 239 [2d Dept 2007]). Therefore, at first glance, defendant cannot assert standing or the unjust enrichment claim unless he moves to amend his answer to include the defense of standing and a claim for unjust enrichment (CPLR 3025 [b]; see *U.S. Bank, N.A. v Sharif*, 89 AD3d 723 [2d Dept 2011]). However, "the court may grant any type of relief within its jurisdiction ap-

propriate to the proof whether or not demanded, imposing such terms as may be just" (CPLR 3017 [a]). This is particularly permissible in an equitable action (*Hochen v Rubin*, 24 AD2d 254, 256 [1st Dept 1965] [in an action in equity, "defendant would not be prevented from obtaining affirmative relief, even though his answer contained no demand for an affirmative judgment"], *affd* 18 NY2d 866 [1966]), which is the type of action sub judice (*see Mortgage Elec. Registration Sys., Inc. v Horkan*, 68 AD3d 948, 948 [2d Dept 2009] ["A foreclosure action is equitable in nature and triggers the equitable powers of the court"]). Additionally, it is possible that a court may, sua sponte, amend the defendant's answer to conform it to the evidence presented (CPLR 3025 [c] ["The court may permit pleadings to be amended before or after judgment to conform them to the evidence, upon such terms as may be just including the granting of costs and continuances"]). Case law reveals that the court can use its discretion to conform the pleading upon a full adjudication of the merits, i.e., where proof is introduced to the court before, during, or after trial (*Murray v City of New York*, 43 NY2d 400 [1977] [granting motion to amend answer to include defense during trial]; *Rothstein v City Univ. of N.Y.*, 194 AD2d 533, 534 [2d Dept 1993]), or upon motion for summary judgment (*Thailer v LaRocca*, 174 AD2d 731 [2d Dept 1991]; *Werner v Katal Country Club*, 234 AD2d 659, 661-662 [3d Dept 1996] ["since a summary judgment motion is the procedural equivalent of a trial, Supreme Court was free to invoke the provisions of CPLR 3025 (c)" (citations omitted)]), or at any time (*see Cave v Kollar*, 2 AD3d 386, 387-388 [2d Dept 2003])—only "in the absence of a showing of prejudice to the plaintiff" (*id.*; *see also Loomis v Civetta Corinno Constr. Corp.*, 54 NY2d 18, 23-24 [1981]).

◼ In *Thailer*, upon a third-party defendant's motion for summary judgment, dismissing the third-party complaint, "the court searched the record and determined that a release signed by the plaintiff might bar his action. The court adjourned the motion to afford all parties an opportunity to address this issue" (*Thailer*, 174 AD2d at 732). The Second Department stated that "[p]ermission to amend pleadings should be freely given absent prejudice to the other side, and pleadings may be conformed to the proof at any time (*see*, CPLR 3025 [c])" (*Thailer*, 174 AD2d at 732 [citation omitted]). Thus, the trial court's decision to sua sponte raise a defense that was not pleaded by the third-party defendant was proper, as "[t]he

plaintiff addressed this issue on the merits and failed to raise any claim of prejudice" (*Thailer*, 174 AD2d at 732). Here, similar to *Thailer*, a substantive cross motion has been made to dismiss the action on standing and for affirmative relief under a theory of unjust enrichment, and the plaintiff had full opportunity to respond and, in fact, opposed the motion on the merits. Therefore, the court now reviews the evidence presented for its sufficiency in determining whether defendant's answer should be amended and whether defendant is entitled to the relief it seeks.

Unjust Enrichment

In assessing a claim for unjust enrichment, "courts will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent" (*Paramount Film Distrib. Corp. v State of New York*, 30 NY2d 415, 421 [1972]). Defendant's claim for unjust enrichment is essentially based on the argument that it is against equity and good conscience to permit Citi to keep the trial payments because it has not demonstrated standing to foreclose. In support, defendant alleges the following facts that satisfy the elements of his claim: the trial payments were made, as a result of mistake of fact or law, because plaintiff was not entitled to collect them; the benefit of those payments still remains with plaintiff Citi; Citi has changed its position as a result; and Citi fraudulently obtained those payments by misrepresenting a material fact—that it owned the note and mortgage—with the intent to deceive defendant Sulton into making those payments; defendant Sulton justifiably relied on such representations; and it caused him injury.

Defendant also argues that, based upon very similar allegations, the trial payments should be reimbursed as a remedy for failing to negotiate in good faith under CPLR 3408 (*see* defendant Andre Sulton's mem of law for bad faith hearing, dismissal of plaintiff's complaint, equitable relief, and such other relief deemed fair and just by the court dated Nov. 18, 2013 by Carl E. Person [hereinafter defendant's mem] at 16). The court assumes that, because defendant presents this alternative theory for recovery of the trial payments (which is appropriately discussed infra, in the CPLR 3408 good faith section), plaintiff appears to blend the two claims together, and cites to CPLR 3408 (h). Plaintiff also argues in opposition that the parties

have a contract, at least with respect to the first HAMP trial modification, and cites to section D of the agreement, providing for how the trial payments are to be applied. It went on to state that "[t]here is no reason why the Plaintiff would not adhere to the contact [sic] as agreed to either apply the payments to the principal balance or hold the funds in 'a non-interest bearing account'" (Link opp ¶ 56). Neither of these points address a claim for unjust enrichment, or even mention that the claim is not in defendant's answer. Even though plaintiff had an opportunity to respond on the merits, it failed to refute defendant's claim. However, the court will attempt to generally entertain the merits of plaintiff's arguments.

CPLR 3408 (h) states "A party to a foreclosure action may not charge, impose, or otherwise require payment from the other party for any cost, including but not limited to attorneys' fees, for appearance at or participation in the settlement conference." As an initial matter, the court notes that plaintiff repeatedly argues that rule 3408 does not and should not apply to the instant action because the premises are not owner-occupied, yet here submits that it does apply in order to support its position on, and/or its general defense against, having to pay any costs or fees to defendant. Ultimately, however, to the extent that any portion plaintiff's response to defendant's unjust enrichment claim is premised on rule 3408 (h), the court only notes that rule 3408 has nothing to do with a claim for unjust enrichment—thus rendering that portion of plaintiff's opposition inapplicable to the instant discussion.[13]

---

**13.** Plaintiff's CPLR 3408 (h) argument in opposition does not nearly address the premise behind defendant's argument. Plaintiff seems to jump the initial step of determining whether plaintiff's conduct, as alleged by defendant, constitutes a lack of good faith and, instead, argues that the sanction would be inappropriate, claiming that a "refund" of trial payments "contradicts the legislative intent and express language of the CPLR 3408" (Link opp ¶ 57). Even if this court had established that plaintiff's conduct, as alleged by defendant, constitutes a lack of good faith, plaintiff's argument that subdivision (h) prohibits reimbursement of the trial payments is entirely frivolous and without any support. The Appellate Division, Second Department has specifically held that a court can fashion its own remedies, including monetary sanctions (*see Wells Fargo Bank, N.A. v Meyers*, 108 AD3d 9 [2d Dept 2013], citing *Deutsche Bank Trust Co. of Am. v Davis*, 32 Misc 3d 1210[A], 2011 NY Slip Op 51238[U] [Sup Ct, Kings County 2011]). Thus, CPLR 3408 (h) has not been discussed or cited as a bar to impose monetary remedies for violating rule 3408 (*see Meyers*, 108 AD3d 9, citing *Bank of Am., N.A. v Lucido*, 35 Misc 3d 1211[A], 2012 NY Slip Op 50655[U] [Sup Ct, Suffolk County 2012] [court imposed exemplary damages], *revd* 114 AD3d 714,

Plaintiff also argues that the HAMP trial is a contract between the parties, and that there is no reason why plaintiff would not adhere to section D of that trial agreement in its handling of the HAMP trial payments. The court finds that section D does not seem appropriate because it assumes that the trial modification will become permanent. The proper section that governs this issue is in section 2 (F) of the HAMP trial agreement, which provides for the possibility that the plan will terminate. In this case, the plan probably terminated because Citi did not provide "a fully executed copy of this Plan and the Modification Agreement" and/or because the borrower's representation in section 1 (B), that the borrower "live[s] in the Property as [his] principal residence," was not true. In such situation, the agreement states that "the Loan Documents will not be modified and this Plan will terminate . . . and any payments [defendant made] under this Plan shall be applied to amounts [he] owe[s] under the Loan Documents and shall not be refunded to [him]." Thus, taking the HAMP trial agreement at face value, and without rewriting the parties' agreement (*see Meyers*, 108 AD3d at 21-23), Citi's own drafted trial agreement states that it will apply those amounts under the loan documents. But plaintiff has not shown where the payments have gone. Even in its attempts to do so, discrepancies arose (*see supra*; Link 3408 affirmation, exhibit P). The money, to date, remains unaccounted for.

It would make sense for the court to order the parties to adhere to section 2 (F) of the HAMP trial agreement. However, the court cannot say for certain that the parties have a contract with actual enforceable rights and obligations, even if plaintiff concedes as such.[14] The Appellate Division, Second Department recently held that a borrower does not have a private cause of action under the Home Affordable Modification Program

---

715 [2d Dept 2014] [sanction was without notice, depriving plaintiff of due process], and *Emigrant Mtge. Co. Inc. v Corcione*, 28 Misc 3d 161 [Sup Ct, Suffolk County 2010], *vacated on rearg* 2010 NY Slip Op 33906[U] [Sup Ct, Suffolk County 2010]; *Deutsche Bank Trust Co. of Am. v Davis*, 32 Misc 3d 1210[A], 2011 NY Slip Op 51238[U], *2 [sanctioning plaintiff's counsel 50% of the loan interest from a date certain]; *see also BAC Home Loans Servicing v Westervelt*, 29 Misc 3d 1224[A], 2010 NY Slip Op 51992[U] [Sup Ct, Dutchess County 2010] [ordering a hearing for the imposition of sanctions for violation of CPLR 3408 (f)]; *JP Morgan Chase Bank, N.A. v Butler*, 40 Misc 3d 1205[A], 2013 NY Slip Op 51050[U] [Sup Ct, Kings County 2013] [same]; *see generally US Bank N.A. v Sarmiento*, 121 AD3d 187 [2d Dept 2014]).

14. Plaintiff does not refer to the second mod agreement as a contract. In any event, the second mod, even if it were a contract, does not speak to what

(HAMP) for a breach of contract (*Davis v Citibank, N.A.*, 116 AD3d 819 [2d Dept 2014]). In *Davis*, the borrowers made the commonly asserted argument that defendant Citibank breached the terms of their HAMP trial period plan (TPP) by failing to permanently modify their loan (*see id.*). They argued that the TPP states CitiBank would modify the loan if they completed their end of the TPP requirements (i.e., to make the trial payments in accordance with the TPP), which they did (*id.*). In dismissing the complaint for failure to state of a cause of action, the Appellate Division found that the statute which authorized HAMP[15] did not provide an express right of action, and one could not be implied because the statute was not promulgated solely for the benefit of struggling homeowners and that implying such a right would be inconsistent with the legislative purpose and scheme (*id.* at 821-823; *see also JP Morgan Chase Bank, N.A. v Ilardo*, 36 Misc 3d 359 [Sup Ct, Suffolk County 2012]).

To be sure, the Appellate Division has also held that, not only is a court prohibited from rewriting the loan documents "or impos[ing] contractual terms which were not agreed to by the parties" (*US Bank N.A. v Sarmiento*, 121 AD3d at 208; *see Meyers*, 108 AD3d 9), but banks, lenders, or servicers are not required or obligated to offer a borrower any loan modification or any specific, desirable terms and/or conditions (*Lucido*, 114 AD3d 714, 715-716 [2d Dept 2014], quoting *Wells Fargo Bank, N.A. v Van Dyke*, 101 AD3d 638, 638 [1st Dept 2012]; *Ilardo*, 36 Misc 3d 359, 379-380). More to the point, however, is that courts cannot even hold lenders to their agreed-upon terms in a loan modification trial agreement or contract (*see Flagstar Bank, FSB v Walker*, 112 AD3d 885, 886 [2d Dept 2013] [trial court's decision to stay proceedings and direct bank to reevaluate defendants' loan under HAMP reversed where trial court's hearing established that the loan was ineligible for HAMP]; *Ilardo*, 36 Misc 3d 359 [declining to adopt the reasoning of the trial court in *Meyers*,[16] which ordered specific performance of a certain loan modification]; *Aurora Loan Serv. LLC v Serrano*,

would occur to the trial payments if the trial period terminated prior to a permanent modification.

15. The Emergency Economic Stabilization Act of 2008 (12 USC §§ 5201-5261) provided the authorization to the Department of Treasury to promulgate HAMP, as discussed by the court in *Davis* (*see Davis*, 116 AD3d at 822).

16. *Wells Fargo Bank, N.A. v Meyers*, 30 Misc 3d 697 (Sup Ct, Suffolk County 2010), *revd* 108 AD3d 9 (2d Dept 2013).

40 Misc 3d 1240[A], 2013 NY Slip Op 51518[U], *2 [Sup Ct, Queens County 2013] [to impose "the terms of the 'trial period' or the terms of a 'Loan Modification' signed by only one party as the new, binding terms of the agreement between [borrower] and Plaintiff is 'unauthorized and inappropriate' "]). Thus here, where the agreement logically and fairly spells out what is to become of those trial payments, it appears as though a court is without authority to force a bank, lender, or servicer to do something, such as adhere to its own modification agreement.

■ If the trial agreements cannot be considered as enforceable contracts, a solution in equity may be possible; consequently, the defendant requests reimbursement of the trial payments under equitable principles. Even if the court considered defendant's claim by conforming the pleading(s) to the proof presented (CPLR 3025 [c]), it cannot be said that all issues have been resolved in order for the court to be assured that defendant should be granted such relief. The court finds that defendant has not proved fraud, or more specifically, that plaintiff intended to deceive defendant. Defendant alleges that plaintiff made two false statements: one being an allegation in the complaint that plaintiff is the owner or holder of the note; the other was plaintiff's alleged statement that it would modify the loan, so long as defendant made the $33,679.70-worth of payments. Defendant further argues that plaintiff knew or should have known about the *Chase* action, such that it knowingly made these representations. However, it cannot be said that plaintiff knowingly made false representations with the intent to deceive defendant. It appears that the status of plaintiff as the noteholder was initially raised by Sulton's requests to see the note, but did not appear to be considered by plaintiff as a pressing issue until Chase filed its RJI in August of 2013—which is after defendant paid the HAMP trial and second mod trial payments (therefore, it cannot be said that plaintiff intended to deceive defendant into making those payments, before its authority to modify came into serious question). The falsity of the alleged statements is quite material to any determination that the court could make with respect to defendant's claim. This is a fact, however, that cannot be decided without nonparty Chase, whom defendant interjects into the proceedings to refute plaintiff's allegation that it has the right to foreclose—an allegation which is central to the

entire arrangement and relationship between the parties.[17] This allegation is contested: in plaintiff's opposition, Mr. Link affirms that he called counsel for Chase, who was "unable to immediately explain the basis for its foreclosure"; plaintiff then continues to state that it is irrelevant because plaintiff has the note (Link opp ¶ 34). And, at the hearing, Mr. Link claimed he recently attempted to follow up with Chase's counsel, asking if there was any "progress," and was advised "No, but it is with the people who—it's with the people who can make a decision and who should get back to [him] in an expedited matter" (tr at 15, line 21 through 16, line 7). Mr. Link appeared to be rather dismissive of the *Chase* action and told the court that, because plaintiff Citi has the note and because the mortgage follows the note, Mr. Link reasoned that "the assignment of mortgage that's been filed by Chase is a nullity, it's nothing . . . it's not really an issue. We hold the note" (tr at 18, line 19 through 9, line 4).

Additionally, to the extent that the unjust enrichment claim is based upon the HAMP trial payments, the court finds that defendant's claim cannot stand because defendant could not justifiably rely on one of the plaintiff's allegedly false statements—that the loan would be modified so long as defendant made the payments—because the defendant himself made a misrepresentation of fact when he signed the HAMP trial by stating that the property was occupied as the borrower's principal dwelling.

The court therefore cannot make any sua sponte decision to add the counterclaim and grant defendant the relief it seeks under CPLR 3025 (c).

### Dismissal with Prejudice Based on Standing

With respect to this branch of defendant's cross motion, the court finds that defendant has proved the standing defense, such that defendant's answer should be amended to include the defense to conform to the evidence presented herein. While the defense of standing is normally waived if not asserted (*see Mastropaolo*, 42 AD3d 239), there is nothing that prohibits defendant from moving to amend the answer under CPLR 3025 (b), especially where, as here, the defense is meritorious and there is no prejudice to the plaintiff (*see Sharif*, 89 AD3d at

---

17. The court finds that a motion to consolidate would be most appropriate, but neither party has moved for such relief and the court is unable to do that sua sponte (*see Tirado v Miller*, 75 AD3d 153, 159 [2d Dept 2010], citing *Lazich v Vittoria & Parker*, 196 AD2d 526, 530 [2d Dept 1993]).

724). When the matter is before the court to conform the pleadings to the evidence under CPLR 3025 (c), the court is to determine the issue "in the same manner and by weighing the same considerations as upon a motion to amend pursuant to subdivision (b)" (*Loomis*, 54 NY2d at 23-24; *see Thailer*, 174 AD2d 731; *Cave*, 2 AD3d 386). Therefore, the court now considers both of these elements.

Meritorious Defense

> "A plaintiff has standing where it is both (1) the holder or assignee of the subject mortgage and (2) the holder or assignee of the underlying note, either by physical delivery or execution of a written assignment prior to the commencement of the action with the filing of the complaint" (*Aurora Loan Servs., LLC v Weisblum*, 85 AD3d 95, 108 [2011]).

A mortgage assignment is incidental to the assignment of a note—i.e., a lien follows a debt. "By contrast, 'a transfer of the mortgage without the debt is a nullity, and no interest is acquired by it' " (*Bank of N.Y. v Silverberg*, 86 AD3d 274, 280 [2011], quoting *Merritt v Bartholick*, 36 NY 44, 45 [1867]). Thus, the key issue is whether plaintiff could demonstrate that it held the note on or before September 21, 2010. Once this issue is raised, plaintiff has the burden of proving its standing (*Silverberg*, 86 AD3d at 279).

As discussed above, plaintiff was unable to show any merit to its action. Plaintiff alleges that the "Original Note was received on April 21, 2008, prior to the commencement of the action on September 21, 2010" (Link opp ¶ 20). As proof, plaintiff submits a party affidavit and a "Correspondence Log" that is supposed to show an entry that was made when the note was received, which is alleged to be April 21, 2008 (Sinner aff ¶¶ 6-8; Link opp, exhibit B), yet nothing in the papers demonstrates what plaintiff purports it to represent. Thus, the only "evidence" plaintiff has to submit is entirely insufficient to demonstrate standing (*Weisblum*, 85 AD3d at 109 [finding plaintiff lacked standing where "the affiant failed to give any factual detail of a physical delivery of (the note) prior to the commencement of the action"]). Additionally, plaintiff attempted to present the note to the court at the hearing, which, as stated, supra, does not establish its possession of the same three years prior (*see* tr at 16).

Defendant also argues that any interest Citi had would be subordinate to Chase's interest, and extinguish by a foreclo-

sure sale in the *Chase* action, subject to surplus monies, if any (*see Fleet Mtge. Corp.*, 272 AD2d 435; *cf. Household Fin. Realty Corp. of N.Y.*, 2 AD3d 192). To recount, MERS assigned a mortgage to Chase on August 13, 2010; Chase filed its notice of pendency, and summons and complaint on September 1, 2010; MERS assigned a mortgage to plaintiff Citi on September 8, 2010; on September 21, 2010, Chase recorded its mortgage assignment and plaintiff Citi filed its notice of pendency, and summons and complaint; and finally plaintiff Citi records its mortgage assignment on September 29, 2010. Plaintiff alleges it attempted to look into the *Chase* action, but in opposition to this argument, its only response is that Chase's mortgage assignment "is a nullity, it's nothing" (tr at 18, line 19 through 19, line 4). Mr. Link stated that it is, at most, "problematic probably for our title people" (tr at 18, lines 24-25).

Defendant's argument that if plaintiff did have standing it would be subordinate to Chase's is compelling, particularly considering plaintiff's utter failure to meaningfully address the issue; but, once again, this court declines to make any such determination on that without nonparty Chase.

However, even without a resolution of that issue, the *Chase* action itself presents a different issue under Real Property Actions and Proceedings Law § 1301. RPAPL 1301 (3) provides that "[w]hile the action is pending . . . no other action shall be commenced or maintained to recover any part of the mortgage debt, without leave of the court in which the former action was brought." Here, the *Chase* action was technically pending while plaintiff Citi commenced this action, in violation of RPAPL 1301 (3) (*cf. McSorley v Spear*, 13 AD3d 495 [2d Dept 2004]). Even if plaintiff Citi could be found to be a proper junior mortgagee, the strictures of RPAPL 1301 (3) are debt-specific, the purpose of which "is to shield the mortgagor from the expense and annoyance of two independent actions at the *same time with reference to the same debt*" (*Central Trust Co. v Dann*, 85 NY2d 767, 772 [1995], quoting *Reichert v Stilwell*, 172 NY 83, 88 [1902]). Thus, this foreclosure action cannot be maintained (*see Central Trust Co.*, 85 NY2d 767 [differentiating between the preclusion of a junior mortgagee's foreclosure action as opposed to an action at law on the note, which is not the case here]).

### Prejudice to Plaintiff

Additionally, the court finds that plaintiff would not be prejudiced by the court's amendment of defendant's answer to

include the standing defense. "Prejudice, of course, is not found in the mere exposure of the [plaintiff] to greater liability. Instead, there must be some indication that the [plaintiff] has been hindered in the preparation of his case or has been prevented from taking some measure in support of his position" (*Loomis*, 54 NY2d at 23-24; *see e.g. Persaud v New York Presbyt. Hosp.*, 18 Misc 3d 767, 770-771 [Sup Ct, NY County 2007]). Here, plaintiff alleges that defendant's counsel "only recently conceived their argument for CitiMortgage's alleged lack of standing" (Link opp ¶ 8). Even though defendant repeatedly asked for the original note, as early as October of 2012, it appears as though both parties were taken by surprise by the *Chase* action in August of 2013. However plaintiff had constructive notice of another claim on the property, as Chase filed its action before Citi, and its lis pendens before Citi. Thus it knew, or should have known, about the issue and cannot claim prejudice or surprise (*see West Side Fed. Sav. & Loan Assn. of N.Y. City v Hirschfeld*, 101 AD2d 380, 384 [1st Dept 1984]; *Matter of Romano*, 8 Misc 3d 1010[A], 2005 NY Slip Op 51011[U], *3 [Sur Ct, Nassau County 2005] [court held that the party "knew or should have known that the payment of rent was an issue by virtue of" it being an issue in past proceedings]). Moreover, the court finds that, once the issue was raised, plaintiff fully responded to the defense on the merits—which also demonstrates that there were no surprises that this court would entertain both parties' arguments on the issue.

Accordingly, the court hereby amends defendant's answer to conform to the proof presented (CPLR 3025 [c]), and finds that plaintiff is unable to demonstrate the requisite standing to maintain the action. The court grants that part of defendant's motion for dismissal; however the dismissal is without prejudice on the condition that, if/when plaintiff Citi chooses to recommence this action, it must seek leave of the court and include in its application, inter alia, an accounting of the defendant's loan and/or history of payments made, including proof demonstrating what became of the defendant's trial loan modification payments. Further, to the extent that Citi has any ability to collect on the loan, all interest, default interest, attorneys' fees, loan modification fees, late charges, and costs, as applicable, that have accrued from the date the first payment was made on the HAMP trial, November 23, 2009, up to the date of this order, is barred from collection or otherwise waived.

### Cancellation of the Notice of Pendency

The remaining branch of defendant's motion is to cancel the notice of pendency under CPLR 6514 (b) and (c). Upon motion, a court can order the cancellation of a notice of pendency "if the plaintiff has not commenced or prosecuted the action in good faith" (CPLR 6514 [b]). In this case, it cannot be said that "the plaintiff commenced this action in bad faith, or is using the notice of pendency for an ulterior purpose" (*Lessard Architectural Group, Inc., P.C. v X & Y Dev. Group, LLC*, 88 AD3d 768, 770 [2d Dept 2011], citing *Reingold v Bowins*, 34 AD3d 667, 668 [2d Dept 2006]). Even though the basis for plaintiff's action has come into question, it does not appear as though the *Chase* action was known at the time, or that this action was otherwise filed in bad faith. Because the action is being dismissed in this order, the notice of pendency shall be cancelled upon this dismissal (CPLR 6514 [a]).

### Good Faith and Other Misconduct

In addition to the motions, the court requested the parties to submit briefs and reply briefs on the issue of the directive. The directive referred the instant matter for "a hearing on bad faith and consideration of the appropriate sanctions for plaintiff's failure to finalize the modification of this loan," adding that "[p]laintiff's counsel has proffered no reasonable excuse for the 5-month delay in finalizing this modification." As of the date of the Referee's directive, June 28, 2013, the notarization and acknowledgment page appeared to be the only issue in the directive. Presumably, the threat of the bad faith hearing and determination of sanctions placed an impetus upon plaintiff to move forward, in some respect, with the second mod; and it reformatted the agreement and sent it to defendant a few days later on July 3, 2013. Though, the issue of those previous trial payments, and how they were to be applied, was a constant issue throughout conferencing. Additionally, when the matter was referred to this court, allegations of plaintiff's counsel's professional misconduct arose during conferences; this will also be discussed, as the parties were given the opportunity to explain their respective positions by briefs and at oral argument. Further, the court takes this opportunity to point out numerous misrepresentations made in the papers by plaintiff's counsel, Mr. Link.

#### Failure to Negotiate in Good Faith

#### Conferences in the FSCP

Plaintiff alleges that, as an initial matter, CPLR 3408 does not protect the defendant, who is a landlord or real estate in-

vestor, and does not use the mortgaged premises as his principal dwelling. Plaintiff claims that it requested that the matter be referred to an IAS part at the first conference on October 23, 2012, and "the Court adjourned the matter over [Mr. Link's] objection to January 7, 2013 and directed that the parties work towards a settlement" (Link 3408 affirmation ¶ 9). Defendant argues that plaintiff submitted to the jurisdiction of the FSCP when it filed its RJI (defendant's mem at 14).

Mr. Link is correct that conferencing pursuant to CPLR 3408 is mandated for specific cases, the criteria of which are set forth in RPAPL 1304 (5) (a) (CPLR 3408 [a]). It is undisputed that the mortgaged premises are not, nor "will be occupied by the borrower as the borrower's principal dwelling" (RPAPL 1304 [5] [a] [iii]); therefore the conference is not mandatory (*see* CPLR 3408 [a]; *see e.g. One W. Bank, FSB v Greenhut*, 36 Misc 3d 1205[A], 2012 NY Slip Op 51197[U], *3 [Sup Ct, Westchester County 2012]; *Indymac Fed. Bank FSB v Black*, 22 Misc 3d 1115[A], 2009 NY Slip Op 50133[U] [Sup Ct, Rensselaer County 2009]).

There are plenty of cases that have addressed whether or not a borrower is entitled to a mandatory settlement conference because of the principal-dwelling requirement, as distinct from one's residency (*see e.g. Accredited Home Lenders, Inc. v Hughes*, 22 Misc 3d 323, 325-327 [Sup Ct, Essex County 2008]; *Black*, 2009 NY Slip Op 50133[U]; *Greenhut*, 2012 NY Slip Op 51197[U]). In these cases, "[a] foreclosure plaintiff bears the burden of showing that the loan subject to foreclosure does not meet these criteria and thus is exempt from a mandatory foreclosure settlement conference" (*id.* at *3). But these cases deal with *mandatory* conferences, i.e., statutorily-required. What, then, are the applicable laws and rules of conferencing when a residential mortgage foreclosure settlement conference is not required by statute, but otherwise "mandated by appearance, reference or request?" Such is the situation under part G of the Kings County Supreme Court Uniform Civil Term Rules (the "Foreclosure Settlement Part Rules" [hereinafter FSP]), where residential mortgage foreclosure settlement conferences are held for matters which do not strictly encompass cases solely falling under the "home loan" definition of RPAPL 1304 (5) (a). The Kings County FSP rules do not differentiate between conferences that are required by statute, or are otherwise "mandated by appearance, reference or request" (FSP rule 1). Therefore, this rule makes the instant action distinguishable

from all the other cases which had to determine whether a foreclosure settlement conference was *mandatory* under CPLR 3408 (*e.g. Hughes*, 22 Misc 3d at 325-327 [examining the principal-dwelling requirement under RPAPL 1304 (5) (a) (iii)]; *Black*, 2009 NY Slip Op 50133[U] [same]; *Greenhut*, 2012 NY Slip Op 51197[U], *3 [same]; *see also Independence Bank v Valentine*, 113 AD3d 62 [2d Dept 2013] [examining RPAPL 1304 (5) (a) (i), (ii)]; *1st United Bank v Wyckoff Enters., LLC*, 41 Misc 3d 1223[A], 2013 NY Slip Op 51819[U], *4 [Sup Ct, Kings County 2013] [same]).

██ Even if conferencing was not statutorily-required, it was otherwise mandated under the FSP rules. The court finds defendant's argument, that plaintiff submitted to the jurisdiction of the FSCP, is particularly compelling, given that plaintiff was the one who requested such conferencing. Plaintiff filed the RJI in this case, which stated that the property is "a one-to [-] four-family owner-occupied residential property," specifically "asserting that the loan was a . . . home loan that CPLR 3408(a) addressed" (*1st United Bank*, 2013 NY Slip Op 51819[U], *2, *4), and sought to have a conference by checking off the nature of this action as "Residential Mortgage Foreclosure Settlement Conference," triggering an appearance in the FSCP. Further, plaintiff came to the FSCP conferences throughout 2013, and later claimed that it made an oral application to remove the matter to an IAS part at the first conference in 2012, which was allegedly denied. Mr. Link's credibility diminished when he also asserted at oral argument, for the first time, that he asked the Referee (and defendant) to discontinue the action, which was also allegedly denied. With no proof, but only vague assertions regarding the putative application(s),[18] the court does not find that any meaningful attempt was made to discontinue the action, or remove the matter from the FSCP—rather, plaintiff continued to conference in the FSCP, toward settling the matter by means of a loan modification for almost one year thereafter. Additionally, even if plaintiff did, in fact, make those oral applications which were allegedly denied, neither defendant, the Referee, nor the court

---

18. The court notes that, from the record before it, the first instance evidencing Mr. Link's alleged "objection" was in an email from Mr. Link to Mr. Delgado dated August 1, 2013—which is only *after* the matter was referred for a bad faith hearing (*see* n 4, *supra* ["Additionally, the matter was held in the Settlement Conference part over my objection and pursuant to the Kings County Foreclosure rules which expand the scope of CPLR 3408 to investment properties"]).

hindered plaintiff from properly making an application by the appropriate motion (*see e.g.* *Greenhut*, 2012 NY Slip Op 51197[U], *3 [plaintiff made a motion to remove the matter from the FSCP alleging the property was not the borrower's primary dwelling and submitted evidence in support]).[19]

Moreover, the Referee did not act improvidently by adjourning the matter to continue to conference. Because the parties had been discussing settlement (namely, the second mod, which was offered to the defendant in Dec. 2012), it was also proper for the Referee to keep the matter in FSCP in accordance with another rule directing that control dates be given in the FSCP "coincident with the trial modification period," when the parties have "agreed to a trial modification, whether under HAMP or otherwise" (FSP rule 7).

### CPLR 3408 (f)'s Obligation to Negotiate in Good Faith

■ Finding that the case was properly before the Referee in the FSCP, the court must now consider whether the obligation of the parties to "negotiate in good faith to reach a mutually agreeable resolution" (CPLR 3408 [f] [hereinafter the good faith requirement or obligation]) extends to both statutory and otherwise-mandated conferences. In light of the fact that the rules of this court allow it to conduct mandatory as well as requested or referred settlement conferences in the FSCP, the court finds that the good faith requirement of CPLR 3408 (f) should apply to all conferences held in the FSCP, and not any differently to residential mortgage foreclosure settlement conferences, generally. Thus, even if the conferences held in the FSCP were not mandatory in this case under CPLR 3408 (a), the court finds that "[o]nce the parties agreed to participate in the scheduled settlement conferences, [plaintiff was] obligated to deal 'honestly, fairly and openly' with [defendant]" under CPLR 3408 (f) (*U.S. Bank, N.A. v Shinaba*, 40 Misc 3d 1239[A], 2013 NY Slip Op 51484[U], *12 [Sup Ct, Bronx County 2013]).

This determination is supported by an inference in the statutory language of CPLR 3408: it first defines the type of cases

---

**19.** At the hearing in chambers on January 14, 2014, Mr. Link asserted that he would "prefer to have a hearing where [he could] cross-examine witnesses . . . maybe even call the referee to see if her account of what happened in the settlement conference part jives with my account and the documentary evidence that's been annexed to my bad faith affidavit" (tr at 19, lines 6-13). The court denies this putative request for a further hearing, and notes that the hearing date was agreed upon by all parties and the court approximately two months earlier, which was sufficient time for Mr. Link to have made such requests—not while the hearing is already in progress.

that *must* have these settlement conferences in subdivision (a). Subdivisions (b) and (c) begin with "[a]t the initial conference *held pursuant to this section*" and "[a]t any conference *held pursuant to this section,*" respectively (CPLR 3408 [b]-[c] [emphasis added]). By contrast, subdivision (f) simply reads "Both the plaintiff and defendant shall negotiate in good faith to reach a mutually agreeable resolution, including a loan modification, if possible" (CPLR 3408 [f]). Thus, unlike subdivisions (b) and (c), whose provisions apply to the conferences held as a result of subdivision (a), subdivision (f) does not differentiate which conferences the rule applies to.[20]

Applying the good faith requirement to all residential mortgage foreclosure settlement conferences held in the FSCP would not upset or conflict with the scope or purpose of the conferences, which is to put a borrower and his/her lender at the table to discuss settlement and "the relative rights and obligations of the parties under the mortgage loan documents" (*Astoria Fed. Sav. & Loan Assn. v Rigano*, 36 Misc 3d 630, 632-633 [Sup Ct, Westchester County 2012] [emphasis omitted]). Having conferences also "brings both parties to court, identifies the issues, and coordinates access to the growing array of services and resources being made available to homeowners[,] [which] would significantly assist the courts in disposing of these cases more expeditiously and effectively" (NY St Bar Assn, President's Committee on Access to Justice, Mem in Support, Bill Jacket, L 2008, ch 472 at 23 [quoting testimony of Chief Administrative Judge Ann Pfau]).

Additionally, the purpose of the good faith requirement itself would not be undermined if it applied to all conferences in the FSCP. According to legislative history, "[t]he purpose of the good faith requirement is to ensure that both plaintiff and defendant are prepared to participate in a meaningful effort at the settlement conference to reach resolution" (*Sarmiento*, 121 AD3d at 200, quoting Governor's Program Bill Mem No. 46R, Bill Jacket, L 2009, ch 507 [alterations omitted]). One court further elaborated on its purpose, stating that it "was imposed to prevent one party to a mortgage contract from behaving in a

---

**20.** The same reasoning cannot be applied to the good faith requirement under the Uniform Rules for Trial Courts (22 NYCRR) § 202.12-a (c) (4). The language of that statute states that *the entire section* only applies to actions "in which the defendant is a resident of the property subject to foreclosure" (Uniform Rules for Trial Cts [22 NYCRR] § 202.12-a [a]). Even though the property is not the borrower's principal dwelling (RPAPL 1304 [5] [a] [iii]), it is unlikely that defendant could be considered as a "resident" of the property.

manner that evades the spirit of the settlement conferences or denies the borrower the opportunity to reach a mutually acceptable solution" (*Shinaba*, 2013 NY Slip Op 51484[U], *9). None of this insinuates that the good faith requirement's purpose is dependent upon a borrower's dwelling or residency, and the court does not see a reason for carving out subdivision (f) of CPLR 3408 alone from the rest of the residential foreclosure settlement conference rules that apply in the FSCP.

It is true that the goal of CPLR 3408, and other laws created or amended by the subprime residential loan and foreclosure laws (L 2008, ch 472), was to keep homeowners in their homes, and does not appear to protect owners of investment properties and second homes (*see Hughes*, 22 Misc 3d at 325-327; *see generally* Hon. Mark C. Dillon, *The Newly-Enacted CPLR 3408 for Easing the Mortgage Foreclosure Crisis: Very Good Steps, But Not Legislatively Perfect*, 30 Pace L Rev 855, 856 [2010]). However, as noted above, the purpose of the good faith requirement is not dwelling-specific; whereas the purpose of the mandatory conferences in CPLR 3408 is clearly established through subdivision (a), confining its mandate to cases fitting within limited criteria, including owner-occupied situations. In the cases where FSCP conferences are otherwise mandated, especially here, where it was requested and sought after, the obligation should apply as if it were a mandatory conference, solely because it is a residential mortgage foreclosure settlement conference that is being held within the FSCP (*cf. HSBC Bank USA v McKenna*, 37 Misc 3d 885, 889 [Sup Ct, Kings County 2012]).[21]

To be sure, the alternative to imposing the "good faith" requirement, leaves only the common-law standard of "bad faith"—which requires "a showing of gross disregard of, or conscious or knowing indifference to, another's rights" (*Sarmiento*, 121 AD3d at 202-204). The Appellate Division, Second Depart-

---

**21.** In discussing plaintiff's possible waiver of the CPLR 3408 (f) requirement, the court in *HSBC Bank USA v McKenna* opined that "[t]here is nothing about the failure to seek an exemption from a conference, or about participation in settlement conference proceedings, that evinces an intent to subject oneself to an enforceable obligation to act in 'good faith' where the obligation would not otherwise exist" (37 Misc 3d 885, 898 [Sup Ct, Kings County 2012, Battaglia, J.]). While the point is well-reasoned (but not authoritative), this court clearly finds that such obligation *would* otherwise exist, if not for the place of the borrower's primary dwelling, due to the fact that the settlement conferences are otherwise mandated—and were in fact requested in this case.

ment rejected that argument as the standard for determining what it means to negotiate in good faith under CPLR 3408 because that standard "would permit a party to obfuscate, delay, and prevent CPLR 3408 settlement negotiations by acting negligently, but just short of deliberately, e.g., by carelessly providing misinformation and contradictory responses to inquiries, and by losing documentation" (*id.*). There is no doubt that the potential for that type of behavior is foreseeable in all residential mortgage foreclosure settlement conferences—without regard to the type of loan or type of borrower. Indeed, if this court were not to extend the good faith requirement to all residential mortgage foreclosure settlement conferences, the likelihood that the behavior the Second Department sought to thwart would be even more abundant, leading one to question the need or desire for any settlement conferences at all. Accordingly, the court sees no reason why the common-law standard should not, similarly, be rejected in cases where residential foreclosure settlement conferences are otherwise mandated.

In making this determination, the court limits its holding to all conferences being held in the FSCP. Any interpretation that creates a distinction between statutorily-required and otherwise-mandated conferences held in the FSCP is, not only substantively undesirable, but impractical and likely more burdensome for "an already-overburdened judiciary" (*see* Hon. Mark C. Dillon at 887; *see also Bank of Am., N.A. v Maharaj*, 29 Misc 3d 1202[A], 2010 NY Slip Op 51665[U], *2 [Sup Ct, Suffolk County 2010]). Otherwise the courts would have referees, and other judges and hearing officers, imposing different standards of conduct on the parties in cases where, as here, the parties submitted themselves to the FSCP and were properly before the Referee.

The court's holding to apply the good faith obligation to the FSCP conferences is made in line with the reasoning of existing case law where the good faith requirement has been, in fact, extended and broadened beyond the mandatory conference. For example, in *Wells Fargo Bank, N.A. v Meyers*, the Appellate Division, Second Department upheld the trial court's determination that there was a violation of the obligation by examining, inter alia, the parties' conduct that occurred outside of the mandatory conference, including pre-commencement conduct (108 AD3d 9). By focusing on the negotiations themselves, a determination on good faith takes into account the conduct of the parties before and after the actual mandatory

conference(s) because of its relevance "in the overall context of *the parties' relationship* and *the negotiations between them*" (*id.* at 17 [emphasis added]). Another court held that a borrower, who was otherwise entitled to request a mandatory settlement conference under CPLR 3408, was estopped from doing so due to the fact that the borrower had "actively participated in numerous court-mandated settlement conferences and out-of-court settlement conferences" (*Rajic v Faust*, 39 Misc 3d 1234[A], 2013 NY Slip Op 50877[U], *6 [Sup Ct, Westchester County 2013]). Although "not specifically labeled 'mortgage modification conferences,' " all of the settlement negotiations in the other conferences between the parties in *Rajic* served the same purpose of discussing settlement in a way that the "mandatory" ones would have done as well (*id.*). Thus, a residential mortgage foreclosure settlement conference by any other name is still a residential mortgage foreclosure settlement conference.

The court also does not see a reason why, then, the good faith requirement should not continue to extend to any given case when the settlement negotiations continue upon transfer or referral to an IAS part. Such extension may help provide some consistency between the various ways different judges handle foreclosure settlement conferences, at least with respect to the required standard of conduct (*see* Hon. Mark C. Dillon at 887 ["Each judge throughout the state may handle the conferences differently: either in chambers or in open court, on motion days or in special session, personally or through a law secretary, with or without meaningful negotiation"]).

For the foregoing reasons, the court finds that the *good faith* requirement of CPLR 3408 (f) should apply to all residential foreclosure settlement conferences held in the FSCP, whether mandatory or otherwise mandated under the Kings County FSP rules, particularly where, as here, plaintiff's actions brought the matter to the FSCP. Thus, once the parties agreed to participating in the settlement conferences in the FSCP, both parties were obligated to negotiate in good faith (*see Shinaba*, 2013 NY Slip Op 51484[U], *12).

Good Faith Determination

The Appellate Division recently held in *US Bank N.A. v Sarmiento* that the "issue of whether a party failed to negotiate in 'good faith' . . . should be determined by considering whether the totality of the circumstances demonstrates that the party's conduct did not constitute a meaningful effort at reaching a

resolution" (121 AD3d at 203-204). The appellate court went on to set forth what possible type of conduct would constitute a violation:

> "Where a plaintiff fails to expeditiously review submitted financial information, sends inconsistent and contradictory communications, and denies requests for a loan modification without adequate grounds, or, conversely, where a defendant fails to provide requested financial information or provides incomplete or misleading financial information, such conduct could constitute the failure to negotiate in good faith to reach a mutually agreeable resolution" (*id.*).

Additionally, the courts have also found a failure to negotiate in good faith for unsubstantiated and unexplained charges, misrepresentations of fact (*Meyers*, 108 AD3d 9; *Wells Fargo Bank, N.A. v Ruggiero*, 39 Misc 3d 1233[A], 2013 NY Slip Op 50871[U] [Sup Ct, Kings County 2013]; *Butler*, 2013 NY Slip Op 51050[U] [Sup Ct, Kings County 2013]), refusal to honor agreements (*Meyers*, 108 AD3d 9; *Ruggiero*, 2013 NY Slip Op 50871[U]), and a plaintiff's blatant refusal to consider any alternatives except foreclosure (*IndyMac Bank F.S.B. v Yano-Horoski*, 26 Misc 3d 717, 718 [Sup Ct, Suffolk County 2009], *revd on other grounds* 78 AD3d 895 [2d Dept 2010]). Notably, in a case similar to the one sub judice, the court in *US Bank N.A. v Gioia* held that, just by moving to discontinue the action without completing the conferences and while a loan modification was still on the table, constituted a violation of the obligation to negotiate in good faith (42 Misc 3d 947). The Appellate Division has also made clear that a lender's refusal to make an offer with the exact terms and conditions as desired by a borrower does *not* constitute a violation of the good faith requirement (*Lucido*, 114 AD3d 714, 715; *Van Dyke*, 101 AD3d 638).

In this case, the basis for the Referee's referral is based upon its finding that the plaintiff had no excuse for its five-month delay in finalizing the modification. The court does not, however, accept plaintiff's argument that, because that is the only issue noted in the directive, that is the only issue for the court's consideration in making this determination (*see Meyers*, 108 AD3d at 17). At the onset of negotiations between plaintiff and defendant, which occurred sometime in late 2009, the court finds that, if plaintiff knew the premises to not be owner-occupied, plaintiff provides no reason for offering defendant a HAMP loan modification, which requires that the borrower oc-

cupy the premises as his/her principal dwelling. It then collected seven payments in the amount of $2,775.50 for five months, plus fees, and issued a letter on September 3, 2010, denying the HAMP trial because the premises were not owner-occupied—something it allegedly knew all along. However, at the same time, it cannot be said that only plaintiff can be faulted for engaging in this HAMP trial. Section 1 (B) of the HAMP trial agreement that defendant signed listed the borrower's representations to the lender, one of which included the representation that the borrower "live[s] in the Property as [his] principal residence," which is an obvious misrepresentation.

Aside from that, plaintiff claimed that it was allowed to send defendant that HAMP trial agreement and collect payments pursuant to HAMP Supplemental Directive 09-01. Specifically, plaintiff alleges it was "directed by the government to have the Borrower begin making trial payments before an underwriter could verify the account for eligibility" (affirmation in reply to defendant's brief alleging bad faith pursuant to CPLR 3408 by Mr. Link dated Dec. 19, 2013 [hereinafter Link 3408 reply affirmation] ¶ 27). This is incorrect and misleading for two reasons: (1) the section quoted by plaintiff in its papers actually states that a servicer can send the borrower a HAMP trial plan before verifying eligibility and income, only upon some "recent verbal financial information," which is not stated here; and (2) the government did not "direct" servicers to do this, as the section goes on to state that, alternatively, borrowers can submit all of their financial information and, upon eligibility, a HAMP trial plan could be sent to the borrower (Link 3408 reply affirmation, exhibit F at 5). Moreover, these very same HAMP rules state,

> "If the servicer determines that the borrower does not meet the underwriting and eligibility standards of the HAMP after the borrower has submitted a signed Trial Period Plan to the servicer, the servicer should promptly communicate that determination to the borrower in writing and consider the borrower for another foreclosure prevention alternative" (Link 3408 reply affirmation, exhibit F at 15).

Here, assuming that plaintiff did not know the premises were not owner-occupied (which has not been alleged), it is unclear when exactly plaintiff found out, but was likely sometime be-

tween November 23, 2009 and September 3, 2010, the latter of which is the date of the letter denying the HAMP modification. It does not seem as though plaintiff "promptly" communicated the determination and also "consider[ed] the borrower for another foreclosure prevention alternative," as it filed this suit shortly thereafter, on September 21, 2010 and no other alternative was offered to defendant until two years later.

Also, sometime during the nine months while the HAMP modification was pending, defendant received a letter dated May 21, 2010 stating that his loan is in default (even though he had been making modified payments through Apr. of 2010).

The story of this case, so far, is that plaintiff offered defendant a HAMP trial and allegedly knew it was not owner-occupied; claimed original default on the loan in May 2010 while the loan modification was pending, then denied the HAMP modification in September, and then, shortly thereafter, filed a complaint that states that defendant failed to make his monthly installment on the loan due February 1, 2010[22] which all seems rather inconsistent and without a logical explanation.

Moving forward, the first issue that arose during conferences in the FSCP concerned the acknowledgment page of the second mod. On January 7, 2013, defendant (appearing pro se at the time) went to the conference, and explained to the Referee and counsel for plaintiff that a notary public would not acknowledge his signature because the acknowledgment was not on the same page as his signature. It is unclear how the parties left off, exactly, with respect to this issue and Mr. Link's affirmation does not provide any version from plaintiff of what happened at this conference. It may not be relevant because, thereafter, defendant had a notary public acknowledge the signature on the same page as defendant's signature, and then emailed it to Mr. Link. Mr. Link told defendant that he did not think his client would accept the agreement as sent by defendant and then sent defendant a "fresh" agreement, stating that the separate acknowledgment page would have to be signed. Although, at the hearing, Mr. Link stated that, upon receiving defendant's email on January 25, 2013, he looked into it by "verifying with Executive Law Section 306," advised the client of the situation, and then stated that "[n]othing could be done" (tr at 9, lines 13-25). Mr. Link, however, did not elaborate on whether

---

**22.** The complaint is not verified by plaintiff (see n 2, supra).

he actually advised defendant, or the Referee (or later, defendant's counsel), that he actually looked into the issue and that nothing could, in fact, be done (which, as it turns out, is not entirely true, as the agreement was later reformatted).

By the time the next conference occurs on March 1st, Mr. Link claims that he already knew that nothing could be done about the borrower's signature page and the acknowledgment page. Mr. Link alleges in plaintiff's papers that he asked defendant's counsel whether the agreement needed to be changed in order to facilitate a settlement, to which defendant's counsel stated that the "notary page was no longer an issue." Defendant Sulton claims that, at this conference, plaintiff's counsel stated it would take the signed and notarized agreement under consideration. This is reiterated in Mr. Delgado's letter which stated that counsel appearing on behalf of Sweeney Gallo stated the borrower's signature page was unacceptable, and then advised that this issue would be further investigated. The parties' versions of what occurred at the March 1st conference are not necessarily inconsistent with each other's, but do not have a logical explanation. If Mr. Link had already looked into the issue, and determined that nothing could be done, then it is unclear (1) why both defendant and defendant's counsel claim that plaintiff stated, for the first time, that it would look into whether it could accept the agreement as it was signed and notarized by defendant; and (2) why Mr. Link would ask Mr. Delgado whether the notary format needed to be changed to facilitate a settlement. Moreover, it is unclear how Mr. Link could affirm that he specifically spoke to Mr. Delgado in person at that conference; whereas Mr. Delgado emailed Mr. Link afterward, on April 18, 2013, introducing himself, and also stated in a letter to Mr. Link dated August 20, 2013 that "during the March conference, *counsel appearing on behalf of your office* advised that [the agreement was unacceptable]" (emphasis added). Additionally, the aforementioned email correspondence in April between Mr. Delgado and Mr. Link,[23] appear to show that defendant was waiting on plaintiff to advise whether the agreement was acceptable (*see* Link 3408 affirmation, exhibit J).

The outcome of the following conference on May 21st is clearer, as the Referee stated in the directive that "[a]fter a

---

**23.** The court notes that only plaintiff submitted email correspondence, but defendant has not objected to the emails, nor claimed that the evidence presented would be misleading without further, follow-up email communications.

lengthy discussion at the May 21, 2013 conference, the matter was adjourned to give plaintiff the opportunity to decide whether to accept the notarized signature without the acknowledgment or to re-draft the agreement." The directive went on to state that at the last FSCP conference, held on June 28, 2013, "plaintiff's counsel indicated that her client has agreed to re-draft the document, but the draft is being reviewed by the Legal Department" (directive at 2). Yet plaintiff's own account(s) of what its position was at the last FSCP conference prove to be evidently confusing and inconsistent. Mr. Link provided a different version of that conference at oral argument, stating that, after the conference on May 21, 2013, he brought up the issue with its client, Citi, who was "unable to address that concern" in time before the next conference on June 28, 2013, apparently because "[i]t was a very difficult thing to do" within five weeks (tr at 11, line 20 through 12, line 16). Simultaneously, Mr. Link's affirmation definitively stated that "[p]laintiff's counsel appeared to explain that CitiMortgage was unable to change the format of their Modification Agreement to accommodate the Defendant" (Link 3408 affirmation ¶ 31).

Eventually, defendant received a revised agreement on July 3, 2013. Yet on August 12, 2013, defendant received the original, problematic version of the same agreement, creating a bit of confusion.

Of course, a lender or servicer is not obligated to offer a modification on the specific terms and conditions that are desired by the defendant (*Lucido*, 114 AD3d at 715); however, this minor formatting issue hindered the modification process for at least five months. All plaintiff had to do was look into the matter, and advise the defendant and the Referee of the client's determination. Instead, plaintiff's counsel provided inconsistent, confusing, and potentially misleading information, with all of its various accounts of what occurred. This issue is not something that should have taken six months to resolve.

Additionally, defendant requested an accurate and legible accounting of what became of the previous HAMP trial payments, and clarification as to how the second mod payments were to be applied. Defendant, individually, sent QWRs to both plaintiff and plaintiff's counsel, on October 23, 2012 and on February 20, 2013, and plaintiff did not rebut those allegations or even attempt to create an excuse for not responding—thus, these requests for information to which he was entitled went

completely ignored. Additionally, defendant alleges that he requested an accounting of the HAMP trial payments at the January 7, 2013 conference because he did not see how those payments were reflected in the second mod agreement. Thereafter, counsel for defendant also made requests for a legible breakdown of his client's payment history, by Mr. Delgado's email on April 18, 2013 and by Mr. Person's letter dated July 2, 2013. Mr. Link attempted to reply to the request by email on July 3, 2013, but defendant's counsel was unable to tell how that document showed what Mr. Link claimed it showed. The email correspondence between counsel thereafter shows that they agreed to continue to work towards a settlement; but, Mr. Delgado reiterated multiple times that nothing in the second mod agreement explains how the funds are to be applied and, therefore, there would not be any settlement absent some written statement as to how the funds will be applied and a clear, concise accounting of the history of the loan. One such email was dated August 8, 2013; the next email in the chain is dated August 16, 2013 from Mr. Link, who, knowing the clear and repeated position of defendant, blindly asks whether Mr. Delgado was "able to work something out" with his client, as he needs "to resolve this as soon as possible" (Link 3408 affirmation, exhibit P)—as if *plaintiff* was waiting on *defendant* to counter or respond with its position, which was actually the opposite. Then, Mr. Delgado requested the information once more in a more detailed letter dated August 20, 2013. Mr. Link responded on August 26, 2013 and stated, with respect to the previous payments, that he would sign a stipulation that the payments would be applied to the principal balance. This was the last discussion towards settlement regarding the previous payments.

Since the Referee issued the directive, plaintiff ended up reformatting its agreement and sent a revised agreement to defendant on July 3, 2013. The defendant was pleased with this, yet also had other issues that it wanted to discuss with plaintiff's counsel before it could agree to signing the modification. These included a plethora of issues, some of which were mentioned throughout conferencing, and some of which were brought up for the first time around August 2013. It is not unreasonable for defendant to try to negotiate with plaintiff—defendant's counsel was trying to make the best deal for its client. Again, as noted above, plaintiff does not have to accept these demands or offer any specific proposal. However, even

though Mr. Link responded on August 26, 2013 to Mr. Delgado's letter, outlining the various issues that stood in the way of defendant's acceptance, the negotiations ended abruptly. Just when the parties appeared to be working with each other and discussing the issues clearly and thoroughly, plaintiff filed its motion to discontinue the action on September 10, 2013.

■ The court finds that the relatively short delay in figuring out the minor acknowledgment-page issue would not, by itself, constitute a lack of good faith. But this delay was accompanied by conflicting and/or inconclusive information from various representatives of Sweeney Gallo. Neither would be the inability to clearly show what became of defendant's previous HAMP trial payments or how the second mod payments were to be applied because it appears as though plaintiff, in fact, responded numerous times to defendant's requests—yet the problem was that none of the responses were legible or accurate. Indeed, this court could not make sense of any of the evidence presented that attempted to show an accounting of defendant's previous payments. More positively, plaintiff then stated it would sign a stipulation to resolve the issue. However, when viewed under a totality of the circumstances, the aforementioned conduct in conjunction with the motion to discontinue certainly demonstrates a failure to negotiate in good faith, as the plaintiff ceased making any "meaningful effort" towards settlement (*see* Governor's Program Bill Mem No. 46R, Bill Jacket, L 2009, ch 507 at 11; *Sarmiento*, 121 AD3d at 203). The most significant factor that underlies this determination is plaintiff's filing of the motion to discontinue in the midst of conferencing. In doing so, plaintiff effectively made clear its unwillingness to "reach a mutually agreeable resolution," which demonstrates a lack of good faith (*Gioia*, 42 Misc 3d 947, 952 [denying plaintiff's motion to discontinue the action and finding the motion constituted a lack of good faith]).[24]

---

**24.** Defendant also argues that the trial payments should be reimbursed as the remedy for plaintiff's failure to negotiate in good faith, which is alleged as follows: (1) plaintiff engaged in settlement conferences, commenced a foreclosure action and is, three years later, unable to substantiate its allegations with evidence in admissible form; and (2) plaintiff represented that, so long as defendant made the trial modification payments, his loan would be modified—even though plaintiff lacked the legal capacity to modify the loan (*see* defendant's mem at 16). Defendant's argument is premised upon one, massive alleged misrepresentation of fact: that plaintiff had the authority to modify defendant's loan. While misrepresentations of fact may be considered as a factor in failing to negotiate in good faith (*see Meyers*, 108 AD3d 9;

In determining the remedy or sanction for such violation "courts must employ appropriate, permissible, and authorized remedies, tailored to the circumstances of each given case" (*Meyers*, 108 AD3d at 23). Additionally, "courts should be mindful not to rewrite the contract at issue or impose contractual terms which were not agreed to by the parties" (*Sarmiento*, 121 AD3d at 208). A review of case law finds that the type of lawful and permissible sanctions which other courts have imposed for such conduct, has already been directed by the court in deciding the above motion and cross motion, which is to bar plaintiff from collecting all interest, default interest, attorneys' fees, loan modification fees, late charges, and costs, as applicable (*see e.g. Ruggiero*, 2013 NY Slip Op 50871[U]; *Shinaba*, 2013 NY Slip Op 51484[U]; *Gioia*, 42 Misc 3d at 953; *see generally Meyers*, 108 AD3d at 20-21). Therefore, the court does not find it necessary to impose any further sanction.

Frivolousness Conduct—Rules of the Chief Administrator of the Courts (22 NYCRR) § 130-1.1

Pursuant to the Rules of the Chief Administrator of the Courts, a court may award costs or impose sanctions against an attorney or party, or both, for frivolous conduct. The rule provides what conduct is frivolous, and what the court shall consider in making such a determination:

> For purposes of this Part, conduct is frivolous if:
> "(1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law;
> "(2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or
> "(3) it asserts material factual statements that are false.
> ". . . In determining whether the conduct undertaken was frivolous, the court shall consider, among other issues the circumstances under which the conduct took place, including the time available for investigating the legal or factual basis of the conduct, and whether or not the conduct was continued when its lack of legal or factual basis was apparent, should have been apparent, or was

*Ruggiero*, 2013 NY Slip Op 50871[U]; *Butler*, 2013 NY Slip Op 51050[U]), the court does not find that this is the sort of misrepresentation that is intended to fall under the purview of the good faith obligation.

brought to the attention of counsel or the party" (Rules of Chief Admin of Cts [22 NYCRR] § 130-1.1 [c]).

Plaintiff has made numerous material misrepresentations to the court and has asserted arguments that are completely without merit. For example, plaintiff claims that neither defendant nor his counsel ever "articulated to Plaintiff's counsel at any point during the Settlement Conference Process any concerns regarding the status of previously received HAMP trial payments" (Link opp ¶ 44). Mr. Link went on to allege that when defendant "finally vocalized his concern regarding the status of HAMP trial payments," he "promptly" provided it in an email on August 1, 2013 (Link opp ¶ 47). However, the issue of the trial modification payments was brought up multiple times prior to August 1, 2013.[25] The court is bewildered as to how Mr. Link can make such an affirmation and simultaneously submit emails to the court which clearly indicate the exact opposite, i.e., that Mr. Delgado requested such information on at least two separate occasions prior to that date, and can completely ignore Mr. Sulton's own affirmation which states that he requested an accounting of his trial payment history at the conferences held on January 7, March 1, and May 23 in 2013.

Additionally, Mr. Link presents conflicting accounts of what occurred at the conferences. The court is particularly concerned with the last conference, where the Referee stated plaintiff's counsel advised an agreement was being reviewed by its legal department. Even after the directive was issued on June 28, 2013, Mr. Link's versions were starkly different and he continued, through his papers and at the hearing on these issues, to intentionally make misrepresentations of fact to this court (*see U.S. Bank N.A. v Gonzalez*, 99 AD3d 694, 695 [2d Dept 2012]).

With respect to the *Chase* action, Mr. Link's position, that the mortgage assignment is a "nullity" or "nothing," is completely unsubstantiated. The court finds it troubling that plaintiff had a considerable amount of "time available for investigating the legal [and] factual basis" (Rules of Chief Admin of Cts [22 NYCRR] § 130-1.1 [c]), yet submits affirmations

**25.** Mr. Link's email on August 1, 2013 appears to be in response to an email from Mr. Delgado on July 5, 2013, discussing the issue, which does not suggest that such response was "promptly made."

and appears at the hearing months later without anything to report from his purported phone call to Chase's counsel.[26]

Finally, this court finds Mr. Link's consistent representation that Sweeney Gallo could communicate with Mr. Sulton individually because he filed a pro se answer is simply not credible. This contention has absolutely no legal basis and it is repeated again and again. As discussed below, such continual assertion may aggravate the court's finding on the violation of professional misconduct.

Ultimately, however, this court declines to direct a hearing to discuss the foregoing examples (which would be necessary before making any award or imposing any sanctions [*Walker v Weinstock*, 213 AD2d 631 (2d Dept 1995), citing 22 NYCRR 130-1.1 (a), (d)]). Rather, this decision is clearly indicative of the court's displeasure with counsel's behavior, which is behavior that is specifically prohibited by law as stated above.

Violation of the Rules of Professional Conduct

Rule 4.2 (a) of the Rules of Professional Conduct (22 NYCRR 1200.0) states that "a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law."

By sending the "requested" (but actually unsolicited) stipulations to discontinue the action and cancel the notice of pendency to defendant Sulton, knowing that he was represented by counsel, plaintiff's counsel violated this rule. While the counselor appearing for Sweeney Gallo at the conference on September 10, 2013 claimed it was an inadvertent error, Mr. Link argued otherwise. Having a full opportunity to explain or refute the claim of misconduct, Mr. Link alleges that he had numerous discussions with defendant's counsel, Mr. Delgado, about "Plaintiff's intent to discontinue, the Motion, and how it was to be served"; he goes on to affirm that "the parties agreed that service was proper upon the Defendant, as he filed a pro se Answer. There was never any discussion of alleged improper contact with the Defendant" (Link surreply ¶ 4). In support of his allegation that the discontinuance was discussed, Mr. Link submits an email dated September 9, 2013, when he sent the

---

**26.** It is very strange that Chase would do nothing about this issue regarding Citi—as it is possible that Chase would have a significant interest in declaring its priority and/or possibly adding Citi as a necessary, interested party to its own action (*see* RPAPL 1311).

instant moving papers to Mr. Delgado. This does nothing to support Mr. Link's allegation, as the improper communication occurred on or about August 16, 2013 and the improper communication was asking defendant Sulton to sign a *stipulation of discontinuance*—it did not concern service of plaintiff's *motion papers* to discontinue.

Additionally, Mr. Link appears to fault defendant's counsel for his behavior, stating that defendant's counsel "fail[ed] to correct the official court record or notify counsel of their complaint" and claims that it "underscores the manufactured and phony nature of their grievance" (Link surreply ¶ 7). Mr. Link cannot claim that the "official court record" is the reason why correspondence was sent to defendant, individually, rather than counsel. Not only did defendant's counsel file a notice of appearance with the Kings County Clerk's Office on March 4, 2013, and apparently served the same via email to Mr. Link on April 24, 2013 (Link opp, exhibit L), but Mr. Link submits voluminous exhibits demonstrating his correspondence with defendant's counsel and uses their statements and allegations in support of his position. Defendant was undoubtedly represented—however, Mr. Link appears to believe, still, that no violation of any professional rule of conduct occurred. It is clear that Mr. Link specifically acknowledged what occurred, yet he appears unwilling to take any responsibility for the nature of this troubling violation. And even though the communication was from a paralegal, Mr. Link's surreply to the allegation of misconduct serves to confirm that he and Sweeney Gallo are, in fact, in violation of the Rules of Professional Conduct as he knew of the correspondence and ratified it (Rules of Professional Conduct [22 NYCRR 1200.0] rule 5.3 [b] [1]).

In conclusion, plaintiff has no reasonable excuse or defense for violating rule 4.2 (a) of the Rules of Professional Conduct, in conjunction with rule 5.3 (22 NYCRR 1200.0). Similarly, the court declines to conduct a hearing on the imposition of sanctions for violating this rule and would rather let this decision serve as a warning to plaintiff's counsel that such conduct, which runs afoul to the canon of professional ethics, by which this court holds firm, will not be tolerated.

## Conclusion

Plaintiff's motion to discontinue the action is denied. Defendant's cross motion is granted in part to the extent that the action is dismissed; dismissal shall be without prejudice on the

condition that if/when plaintiff Citi chooses to recommence this action, it must seek leave of the court and include in its application, inter alia, an accounting of the defendant's loan and/or history of payments made, including proof demonstrating what became of the defendant's trial loan modification payments; that part of defendant's motion to cancel the notice of pendency is denied as moot; any relief requested not specifically granted herein is denied. Further, to the extent that Citi has any ability to collect on the loan, all interest, default interest, attorneys' fees, loan modification fees, late charges, and costs, as applicable, that have accrued from the date the first payment was made on the HAMP trial, November 23, 2009, up to the date of this order, is barred from collection or otherwise waived.